

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PENTECH PHARMACEUTICALS, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff-Counterdefendant, | ) ) | No. 04 C 3149 |
| v. | ) ) | Hon. Mark Filip |
| PAR PHARMACEUTICAL, INC., a New Jersey corporation, | ) ) ) | |
| Defendant-Counterplaintiff. | ) | |

**MEMORANDUM OPINION AND ORDER GRANTING
SUMMARY JUDGMENT ON COUNTS III AND IV**

This is an inter-corporate dispute between two substantial and well represented pharmaceutical businesses. Pentech Pharmaceuticals, Inc. ("Pentech"), sued Par Pharmaceutical, Inc. ("Par"), for breach of contract (Count I), a declaratory judgment as to the duties created under their contract (Count II), breach of fiduciary duty (Count III), and an equitable accounting (Count IV). (*See* D.E. 18.) Par asserted a counterclaim for fraud in the inducement. (*See* D.E. 47.) This Court previously denied the parties' cross-motions for summary judgment on Count II and Pentech's motion for summary judgment against Par's fraud counterclaim. (*See* D.E. 202.) The case is now before the Court on Par's motion for summary judgment on Counts III and IV, which turns on whether Par owed Pentech a fiduciary duty. (*See* D.E. 74.) Because the Court finds that Par did not owe Pentech a fiduciary duty under the circumstances presented, the Court grants Par's motion for summary judgment and dismisses Counts III and IV.

## FACTS

The Court takes the relevant facts from the parties' respective Local Rule 56.1 statements ("L.R. 56.1"). (*See* Par's Second L.R. 56.1 Statement (not filed electronically); D.E. 175 (Pentech's L.R. 56.1(b)(3) Counterstatement and Statement of Additional Facts); D.E. 191 (Par's Corrected Counterstatement to Pentech's Additional Facts).) The Court resolves all genuine factual ambiguities in Pentech's favor. *See Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). The Court takes no position on whose version of disputed factual matters is true.

L.R. 56.1 requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g., Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584. The Court disregards any additional statements of fact contained in a party's response rather than its statement of additional facts. *See, e.g., Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).

Pentech develops and seeks FDA approval for pharmaceutical drugs. (Par's L.R. 56.1 ¶ 2.) Par manufactures, distributes, and sells pharmaceutical drugs. (*Id.* ¶ 4.) Par's business also

2

includes significant involvement in defending patent infringement suits on behalf of companies such as Pentech. (D.E. 175 at 19.) In March of 2000, Pentech filed an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval for its drug, paroxetine hydrochloride ("paroxetine"), a chemical compound. (Par's L.R. 56.1 ¶ 6.) Two months later, SmithKline Beecham Corp. and Beecham Group p.l.c. (also, collectively, "GSK"[1]) sued Pentech, alleging that Pentech's paroxetine capsule infringed on GSK's patent for its own paroxetine product, the drug more commonly known as Paxil. (*Id.* ¶ 7.) As Pentech's legal bills from GSK's lawsuit grew, Pentech began looking for another company to invest in its paroxetine product and share the costs of litigation. (*Id.* ¶ 8.) To that end, in the fall of 2001 Pentech entered an agreement with Par. (D.E. 175 at 4.)

I.   Pentech and Par's Original Agreement

Pentech and Par entered a Supply and Marketing Agreement (the "Agreement"), which provided that Par would assist in funding the GSK litigation in return for exclusive rights to distribute Pentech's paroxetine capsule if it were approved. (Par. L.R. 56.1 ¶ 10.) Section 2.2 of the Agreement provided that Par would have "ultimate decision making authority in consultation with [Par's outside counsel from the law firm Frommer, Lawrence and Haug ("FLH")] with regard to the . . . litigation; provided, that if the legal fees and expenses related to the . . . litigation exceed $2,000,000, and Par and Pentech share such excess as provided below, then Par and Pentech shall share ultimate decision making authority with regard to the . . . litigation." (Brooks Aff., Ex. 3 at 4 (certain internal punctuation omitted for clarity).) Section 2.2 also provided that Pentech's president "shall be allowed unlimited access to and contact with FLH" in

---

[1] SmithKline Beecham Corp. and Beecham Group p.l.c. are subsidiaries of GlaxoSmithKline.

3


connection with the litigation. (*Id.*) Section 2.3 of the Agreement stated that the GSK litigation could "only be settled upon the mutual satisfactory approval of Par and Pentech." (Par's L.R. 56.1 ¶ 14.) Section 13.1 of the Agreement, entitled "Independent Contractors," further stated:

> The relationship between Pentech on the one hand and Par on the other hand, is that of independent contractors and nothing herein shall be deemed to constitute the relationship of partners, joint venturers nor of principal and agent between Pentech on the one hand and Par on the other hand. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

(*Id.* ¶ 15.)

In May 2002, GSK began expressing an interest in settling the litigation. (*Id.* ¶ 21.) In July, GSK made a settlement proposal to Pentech that was ultimately rejected. (D.E. 175 at 9.)[2] During that summer, and continuing into the fall and winter, the emails and memos exchanged between the parties suggested (at least) that relationships were souring. (*See* D.E. 175 at 19 (Pentech citing a memo from Mr. Haug of FLH to Scott Tarriff of Par, advising him that "[Pentech Vice President Bruce] Ronsen and [Pentech legal adviser James] Rubin should have as little to do with this project going forward as possible."); *id.* at 20 (citing an email from [Pentech Vice President Bruce] Ronsen to [Pentech legal advisor James] Rubin stating, "we depend on you to keep us apprised of ongoing matters in this case," and asking Rubin to "keep us up to date on the activities in this law suit"); *id.* (citing an email from Rubin to Jeffrey Hovden of FLH

---

[2] Pentech states that, immediately following GSK's settlement offer, Pentech's president, Al Hummel, informed Par of the discussions. (D.E. 175 at 10.) The parties dispute the nature of the settlement offer and whether Hummel initially considered accepting it. Pentech states that the offer included no cash but consisted of license rights for Pentech and a "modest quantity" of tablets for Pentech to sell. (*Id.*) Pentech says Mr. Hummel rejected the offer out of hand. (*Id.*) Par asserts that GSK offered Pentech $5 million, which Par claims Mr. Hummel thought was a "considerable sum for Pentech, and that Pentech was therefore considering accepting the offer." (*Id.*; Par's L.R. 56.1 ¶ 23.)

requesting to be kept in the loop and in which Rubin states, "frankly, this is both embarrassing and unacceptable. [T]he last I knew, pentech was still a party to the litigation. . . . [I] would like to be given 'of counsel' courtesies. [I]f that is too difficult, [I] will be happy to point out the situation to the court and request that the court make proper provisions so that [I] can be aware of litigation activities"); *see also* D.E. 191 at 4 (citing Hovden's response to Rubin's email, which states, "I appreciate the (intentional?) irony in the substance and tone of your e-mail message. I've long ago lost count of the number of unreturned voice-mail messages either Rob Colletti or I have left you in connection with this litigation. . . . Perhaps you can provide some time this week when we can have a telephone discussion of a number of outstanding issues.").) Pentech argues that these exchanges show that Par and FLH were trying to cut Pentech out of the loop with respect to the GSK litigation. (D.E. 175 at 19–20.) Par disagrees. "Any implication that FLH ever declined to provide any information requested by Pentech is disputed; Pentech cites no evidence of any such refusal." (D.E. 191 at 4.)

In support of its argument that Pentech was being cut out of the loop, and throughout its statement of additional facts, Pentech cites meetings and conversations among GSK, Par, and Par's lawyers to which Pentech was not privy. (*See* D.E. 175 at 21, 26, 27, 28, 29, 30, 33–34.) However, Par counters that, even when Pentech's representatives did not participate in a meeting (which, according to Par, happened less frequently than Pentech asserts), Par kept Pentech up to date on what was discussed. (*See, e.g.*, D.E. 191 at 5-6, 13, 15, 16, 17, 18, 19.) Much of the support for Pentech's assertion that it was cut out of the loop comes from FLH invoices. (*See, e.g.*, D.E. 175 at 26.) But Par points out that the diary entries for many of those invoices do not establish (a) that Pentech did not participate in the referenced discussion, or (b) that the subject of the referenced discussion was the GSK litigation. (D.E. 191 at 14.)

5

Pentech suggests that Par and GSK pushed Pentech's lawyers, and Mr. Rubin in particular, away from the negotiating table, but it is unclear from the parties' statements of facts whether Mr. Rubin left the case voluntarily or, if he was asked to leave, by whom or why. (*See* D.E. 175 at 21; D.E. 191 at 6 (email communications regarding Mr. Rubin's dwindling role in the litigation leading up to his removal from the case in late October, 2002).) Significantly, it is undisputed that Pentech had legal representation throughout the settlement process.

II.     Pentech and Par's Amended Agreement

It became clear to the parties during the summer and early fall of 2002 that Pentech would need additional financial assistance to continue pursuing FDA approval of its paroxetine capsule. To that end, in November 2002 the parties amended their Agreement with a First Amendment to the Supply and Marketing Agreement ("First Amendment"). (*See* Brooks Aff. Ex. 6; *see also* D.E. 175 at 11.) The First Amendment replaced Section 2.2 of the Agreement with a new Section 2.2 that gave Par "sole and exclusive control" over the GSK litigation, and also for "all regulatory activities related to" the ANDA. (Par's L.R. 56.1 ¶ 18.) It also provided that Par would be fully responsible for all reasonable legal fees and expenses subsequently incurred by Pentech from the GSK litigation. (Brooks Aff. Ex. 6 at A-2.)

The First Amendment did not alter the existing language of the Agreement's Section 2.3 (the settlement provision), but it did supplement that provision with a paragraph providing that "in the event of any settlement to which Pentech and a third party are parties," Par would first be reimbursed for its costs and legal expenses, and then "any remaining amounts that are received by Par and Pentech out of such a settlement will be divided 60% to Par and 40% to Pentech." (Par's L.R. 56.1 ¶ 19; D.E. 175 at 8; Brooks Aff. Ex. 6 at A-2.)

6

Like the Agreement, the First Amendment provided that Pentech's president "shall be allowed unlimited access" to the lawyers at FLH who were handling the GSK litigation. (Brooks Aff. Ex. 6 at A-2.) Furthermore, Section IV of the Amendment stated that all unaltered provisions of the Agreement were to be given full effect, which meant that, among others, Section 13.1 remained effective. (Par's L.R. 56.1 ¶ 20.) As stated above, Section 13.1 provided that the parties were independent contractors and that nothing in their Agreement "shall be deemed to constitute the relationship of partners, joint venturers nor of principal and agent between Pentech on the one hand and Par on the other hand." (Id. ¶ 15.)

Pentech asserts that, following execution of the First Amendment, Par assumed "complete control" over the paroxetine project. Pentech cites deposition testimony that Par "had full control over all elements of the project related to ensuring that the Chicago facility would be capable of manufacturing commercial quantities of solid dispersion." (D.E. 175 at 23.) Par also hired an engineering firm to ready Pentech's Chicago facility for manufacturing the product, and Par both managed that firm's work and paid its fees. (Id. at 23–24.) Par sent one of its scientists, Ramu Surapanaene, to Pentech for several months to review Pentech's lab operations and manage operations and staffing. (Id. at 24.) Par also took over the management of Pentech's relationship with Asahi Glass Co. concerning the supply of the active pharmaceutical ingredient for the paroxetine capsules. (Id. at 24–25.) When one examines the support Pentech offers for the assertions cited immediately above, it appears clear that they principally, if not exclusively, concern operational issues regarding the manufacturing and development of the drug—such as equipment purchasing decisions, employee staffing decisions at a laboratory, and so forth.

In the meantime, in early January 2003, Pentech's outside counsel from Leydig, Voit & Mayer formally withdrew from the litigation. (Id. at 25.) According to Pentech, "[f]ollowing the

7

execution of the First Amendment, Pentech had no meaningful involvement in the [GSK] litigation, or the resolution thereof." (*Id.* at 25.) However, as discussed below, Pentech was involved in settlement discussions, Pentech's board unanimously approved settlement, and Pentech continued to retain other outside counsel who reviewed drafts of settlement documents. (*See, e.g.*, Par's L.R. 56.1 ¶¶ 28, 30.)

III.    Pentech and Par's Settlement with GSK

Following the execution of the First Amendment, Pentech, Par, and GSK had two face-to-face meetings (both attended by Pentech President Hummel), during which the parties had discussions and negotiations concerning a settlement agreement and license and supply agreement with GSK. (*Id.* ¶ 25.) These two discussions, among others that Pentech did not attend (Pentech claims upwards of thirty conversations between FLH and Par in which Pentech allegedly was not a participant, *see* D.E. 175 at 26), led to a proposed settlement. Broadly speaking, the settlement contemplated dismissing GSK's patent infringement suit against Pentech, and, *inter alia*, granting Par a license to sell unbranded paroxetine tablets, manufactured by and subject to a royalty to GSK. (Par's L.R. 56.1 ¶ 31.)

On February 8, 2003, Pentech's Board of Directors met by phone to discuss the proposed settlement. (*Id.* ¶ 26.) Pentech's board unanimously approved the settlement. (*Id.* ¶ 27.) During the board meeting, Mr. Hummel stated that "the product face[d] significant and mounting risks as to its potential to become the first entrant into the market for a generic form of Paxil" and that "the settlement could prove very valuable to Par and Pentech." (*Id.* ¶ 26.) He added that the settlement "would carry some probability that Par and Pentech could gain little or no revenues from the settlement." (Brooks Aff. Ex. 12 at 2.) During the board meeting, FLH attorney Ed Haug also discussed Pentech's disadvantageous position relative to the competition for generic

8

forms of Paxil. (*Id.*) The Pentech Board discussed Mr. Haug's comments "at length" and "unanimously came to a common understanding of Pentech's options relative to the proposed settlement." (Par's L.R. 56.1 ¶ 27.) The Board considered refusing the proposed settlement, but ultimately it "unanimously authorized Mr. Hummel to continue to negotiate for and on behalf of the Company with Par, and to commit the Company to the settlement." (*Id.*) Pentech's board members testified at their depositions that they used their independent business judgment in deciding to vote for the settlement. (*Id.* ¶ 30.)

That same day, February 8, 2003, Par's Board of Directors also met with FLH and another law firm, Piper Rudnick, via a conference call to approve the GSK settlement and to discuss FTC approval issues. (D.E. 175 at 29-30.) Pentech refers to the somewhat cryptic notes of a Piper Rudnick lawyer, taken during this meeting, apparently to show that Par knew it had a contractual duty to Pentech and failed to disclose how the proposed settlement would affect that duty. (*Id.*) On the third page of these handwritten notes, in the middle of the page, is written "40% to Pentech" and "60/40 split all sales." (*Id.*; *see also* Pentech App. Ex. 36 at 3.) Pentech also cites an FLH invoice (*i.e.*, an invoice from a different law firm of Par's) dated February 10, 2003, documenting time billed by an associate for a memo regarding "multiple client representation in a single matter and the necessity for withdrawal when the clients act adversarialy." (D.E. 175 at 30.)

Par responds to these record citations by pointing out, first, that the minutes from the February 8 Par board meeting make no reference to a discussion of Par-Pentech profits splits and that, when the Piper Rudnick lawyer was asked about his notes of that meeting at his deposition, even he was not sure and did not recollect what they referred to. (D.E. 191 at 20.) Second, Par disputes that the FLH conflict memo concerned an adversarial relationship between Par and

9

Pentech. On the contrary, available deposition testimony reflects that "'it had something to do with our representation of Asahi [Glass, a potential supplier of the active pharmaceutical ingredient in paroxetine] on the one hand and Par Pentech on the other.'" (D.E. 191 at 21 (quoting Hovden Dep. at 165–66 (Layden Aff. Ex. 3)).) Moreover, there appears to be no argument that Pentech ever actually retained FLH as its counsel, and, as explained below, Pentech indisputably was employing *other* counsel who reviewed certain settlement drafts. (Par's L.R. 56.1 ¶ 28; *see also* Myles Dep. 211–14 (Brooks Aff. Ex. 4) (stating that outside counsel from Wyrick Robbins Yates & Ponton LLP, among others, reviewed the settlement proposal for Pentech).

In the weeks following the boards' approval of the settlement, drafts of a settlement agreement and the related licensing agreement circulated among the parties. Pentech reviewed at least some of these drafts, and suggested revisions to various provisions. (Par's L.R. 56.1 ¶ 28.) As explained above, the drafts were also reviewed by Pentech's outside law firm. (*Id.*; *see also* Myles Dep. 211–14 (Brooks Aff. Ex. 4).) However, the settlement documents were drafted by Mr. Haug and Mr. Hovden of FLH, and GSK's lawyers, and Pentech asserts that it did not participate in the drafting. (D.E. 175 at 13.) Pentech claims that it believed the license agreement Par received from GSK was part of the settlement consideration given by GSK, and that Pentech was entitled to a 40 percent share of amounts received by Par from the paroxetine sales contemplated by that agreement. (*Id.* at 17.) Pentech further asserts that at least one draft of that license agreement included Pentech as a licensee. (*Id.* at 30.) "Although Par purported to be negotiating the settlement on Pentech's behalf, Par never advised Pentech at any point during negotiations that the <u>exclusion</u> of Pentech as a licensee under the License and Supply Agreement

10

would prevent Pentech from receiving its 40% share of amounts received out of the settlement." (*Id.* at 30–31 (emphasis in original).)

Par disputes the existence of any supposed conflict. (D.E. 191 at 14–15.) On the contrary, "Par pushed for the most advantageous terms possible for both parties, including raising with GSK the issue of a cash payment—which GSK firmly rejected." (*Id.*) Furthermore, and more important, Par points out that Pentech participated in these negotiations on its own behalf, so there was nothing for Par to disclose that Pentech could not or should not have discovered or inquired about on its own. (*Id.*) Par disputes any implication that Par had an obligation to inform Pentech of the significance, if any, of being (or not being) a party to the license agreement. (*Id.* at 22.)

The parties initially executed the Settlement Agreement and License Agreement on February 26, 2003, and then executed amended settlement documents on April 16, 2003. Mr. Hummel personally executed the amended settlement agreement. (Par's L.R. 56.1 ¶ 29.)[3] To

---

[3] In March 2003, Par prepared financial projections to submit to the FTC for its approval of the GSK settlement. Those projections included what Pentech characterizes as a 70-30 percent profit split between Par and Pentech. (D.E. 175 at 31.) Pentech argues in effect that these projections showed that Par was already pulling away from the promised 60-40 percent split memorialized in the First Amendment with regards to settlement proceeds. (*See id.* at 31-32) Par counters that the projections were not prepared to show Par-Pentech profit splits, that such a profit split was irrelevant to securing FTC approval, and that the analyst who compiled the projections "'probably built the model with 30% in there and probably never went back and adjusted it.'" (D.E. 191 at 24 (quoting Dennis O'Connor Dep. at 172 (Layden Aff. Ex. 4)).) In support of this argument, Par points out that the parties' original Agreement specified a 70-30 percent profit split for eventual sales of a generic paroxetine tablet (as distinct from the split of settlement proceeds), which the First Amendment modified to an 85-15 percent profit split. (D.E. 191 at 24.) In any event, the entire subject—*i.e.*, whether Par was pulling away from the purported contractual deal or not—is a subject relevant to Pentech's breach of contract claim, and Par does not explain how it would support the imposition of any fiduciary duty, which as explained at length below, is atypical under New York law, particularly as between sophisticated commercial parties represented by their own counsel in a commercial transaction.

date, Par has made one payment to Pentech following the settlement, in the amount of $16,176,762, and has refused to pay Pentech anything further. (D.E. 175 at 18.)

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley*, 359 F.3d at 928. To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

I.     Count III - Breach of Fiduciary Duty

Pentech's claim for breach of fiduciary duty is governed by New York law. (*See* D.E. 43 at 4.) To succeed on a claim for breach of fiduciary duty under New York law, Pentech must

prove three elements: (1) a fiduciary duty between the parties; (2) defendant's breach of that duty; and (3) damages suffered by the plaintiff that were proximately caused by the breach. *See, e.g., Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison LLP*, No. 06 Civ. 14211 (GBD), 2007 WL 2219485, at *3 (S.D.N.Y. Aug. 2, 2007) (citation omitted). A fiduciary duty arises between parties only when they have a "special relationship that constitutes something more than an arms length contractual arrangement." *Valjean Mfg., Inc. v. Michael Werdiger, Inc.*, No. 03 Civ. 6185(HB), 2004 WL 1948752, at *4 (S.D.N.Y. Sept. 2, 2004). In other words, a fiduciary relationship is created "from the assumption of control and responsibility . . . and is founded upon trust reposed by one party in the integrity and fidelity of another." *Id.* (internal quotation marks and citation omitted).

Generally, New York courts are loath to recognize the existence of a fiduciary relationship between sophisticated contracting parties where the fiduciary relationship is not created explicitly by contract. *See, e.g., Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000) (collecting cases and stating, "[u]nder New York law, parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree."); *id.* at 734 ("Nor can allegations of subjective intent substitute for an absence of objective manifestation of fiduciary obligation in the contracts in question.") (citation omitted); *see also Compania Sud-Americana de Vapores S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992) (collecting cases). This is because parties to most commercial transactions deal at arms length, where "no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise" absent "extraordinary" additional factors. *Compania Sud-Americana de Vapores*, 785 F. Supp. at 426 (internal quotation marks and citation omitted). Thus, in relation to most commercial transactions, a party may have

13

various putative legal remedies to protect its rights and interests—breach of contract, fraud, any number of tort theories, for example—but, as explained, New York courts typically will not find the existence of a fiduciary relation where it is not created by contact, absent "extraordinary" additional factors. *Id.*; *accord, e.g., Calvin Klein*, 123 F. Supp. 2d at 734 ("[S]pecial factors [may] create fiduciary relationships between contracting commercial parties, such as, for example, when one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party.").

Under New York law, the existence of a fiduciary duty "depends on the facts of a particular relationship." *Olshansky v. Sutton*, No. 00 Civ. 3539 (LAP), 2001 WL 99857, at *5 (S.D.N.Y. Feb. 6, 2001) (collecting cases; internal quotation marks and citation omitted). In looking at the facts of this case for purposes of summary judgment review, Par is unquestionably correct that Pentech's relationship with Par as it pertains to the litigation with GSK is a commercial one, premised on a contract that does not explicitly create a fiduciary relationship. (*See* D.E. 43 at 7.) To be sure, an express contractual provision creating a fiduciary relationship is not an absolute *sine qua non*. *See Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (N.Y. App. Div. 1987). The ongoing conduct between the parties may give rise to a fiduciary relationship that will be recognized by the courts, at least in those "limited and unusual circumstances" where the connection between commercial parties involves sufficient dependence to create a fiduciary relationship. *Calvin Klein Trademark Trust*, 123 F. Supp. 2d at 734. However, "a fiduciary relationship generally cannot be implied between parties to a commercial transaction when each party is represented by counsel and other professional advisors who have been retained to protect their best interests." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R.

14

438, 512 (S.D.N.Y. 1994) (citing *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 739 (2d Cir. 1984)).

As explained further below, upon reviewing the record in this case (including all reasonable inferences that can be drawn in this setting on behalf of Pentech) it is clear that given the contractual setting, Pentech placed a normal amount of trust in Par and Par had a routine amount of control in the settlement negotiations with GSK. Par enjoyed no extraordinary superiority over Pentech, a sophisticated and well-heeled pharmaceutical company represented by equally sophisticated attorneys, even crediting all evidentiary disputes in Pentech's favor. This case does not qualify as one of the rare situations where fiduciary duties can be imposed between two sophisticated and ably-represented corporations in a commercial deal.

First, the parties' Agreement disclaims any fiduciary relationship and does not support the imposition of such an extraordinary relationship. Section 13.1 of the Agreement, titled "Independent Contractors," states:

> The relationship between Pentech on the one hand and Par on the other hand, is that of independent contractors and nothing herein shall be deemed to constitute the relationship of partners, joint venturers nor of principal and agent between Pentech on the one hand and Par on the other hand. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement or undertaking with any third party.

(Par's L.R. 56.1 ¶ 15.) Even after the parties amended their Agreement to give Par more control, Pentech's president retained the contractual right to "unlimited access" to the lawyers handling the GSK litigation and a right to approve any putative settlement. (*See* Brooks Aff. Ex. 6 at A-2 ("The President (or similar officer if there is no President) of Pentech, acting in good faith and in furtherance of the Paragraph IV Litigation and in obtaining regulatory approval for a paroxetine product, shall be allowed unlimited access to an [sic] contact with FLH in connection with the

15

Paragraph IV Litigation and regulatory activities related to the Project.").) These contractual provisions weigh heavily against finding a fiduciary duty. Not only do the parties' contracts fail to explicitly create a fiduciary relationship, *see Compania Sud-American de Vapores*, 785 F. Supp. at 426, they cut against finding any such relationship.[4]

Pentech asserts that, despite the contract provisions to the contrary, in fact Par and its lawyers denied Mr. Hummel access and kept him uninformed regarding the litigation and settlement talks. (D.E. 175 at 7.) This allegation would seem to be material in the context of Pentech's breach of contract claim; however, will all respect, it would not seem to cut in favor of finding any unique fiduciary relationship under New York law or to warrant allowing Pentech to seek punitive damages (under a breach of fiduciary duty theory) rather than orthodox breach of contract damages.[5]

Pentech also argues that Par owed it a duty to disclose the potentially negative consequences of the settlement—particularly the fact that Par would not be obligated to pay

---

[4] Pentech argues that the disclaimer set forth in Section 13.1 should not be given any weight because it does not expressly reject the idea of the parties being "fiduciaries" when explaining that they are independent actors and, for example, cannot even serve in a principal-agent relationship towards each other. This argument, with all respect, is unpersuasive. The seminal significance of Section 13.1—when evaluated against New York law that generally requires a putative fiduciary duty as between two sophisticated and legally represented commercial actors to be expressly set forth in writing—is that Section 13.1 cannot be fairly read as any objective indication of intent actually to create such a unique fiduciary relationship. In this regard, Section 13.1 expressly disclaims any relationship of "partners, joint venturers nor of principal and agent"—all typical relations where fiduciary duties might arise. The negative consequence of Section 13.1 for Pentech is particularly apt given that, again, Pentech was a represented and highly sophisticated commercial actor, operating in a financial transaction with other such represented commercial actors.

[5] As stated briefly above, the breach of contract claim is hotly disputed. Par has a triable counterclaim for fraud in the inducement as well, as the Court previously ruled in an earlier summary judgment opinion. (D.E. 202.)

Pentech 40 percent of profits garnered from the sale of GSK's unbranded paroxetine. (*Id.* at 30-31.) But Pentech admits that Mr. Hummel attended settlement discussions, received drafts of settlement agreements, and had a right to refuse the settlement. (*See, e.g.,* Par's L.R. 56.1 ¶¶ 25-29; D.E. 175 at 11-14.) Pentech's board of directors also met to discuss the settlement. (*See, e.g.,* Par's L.R. 56.1 ¶ 27, 30; D.E. 175 at 12, 14, 15.) They considered its pros and cons—including the possibility that Pentech would not see any revenues from paroxetine sales following the settlement—as well as alternatives to settling. (*See, e.g.,* Par's L.R. 56.1 ¶ 27; D.E. 175 at 12.) They recognized they had a choice and were not bound to accept a settlement proposed by Par. (*See, e.g.,* Par's L.R. 56.1 ¶ 27, 30; D.E. 175 at 12, 15.) The board unanimously voted for the settlement, and the board members testified that they did so in the exercise of their independent business judgment. (*See, e.g.,* Par's L.R. 56.1 ¶¶ 27, 30; D.E. 175 at 12, 15.) Moreover, Pentech's outside legal counsel also reviewed settlement documents, and Mr. Hummel was involved in suggesting revisions to those documents once a settlement in principle was reached. (*See, e.g.,* Par's L.R. 56.1 ¶ 28; D.E. 175 at 13.) Mr. Hummel personally executed the revised Settlement Agreement on April 16, 2003. (*See* Par's L.R. 56.1 ¶ 29; D.E. 175 at 13-14.)

Pentech has failed to offer any meaningful evidence indicating that it placed sufficient trust and confidence in Par to trigger any extraordinary fiduciary obligations. *See Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 739 (2d Cir. 1984) (citing *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir. 1984)). Indeed, throughout the course of this transaction, Pentech's representatives confirmed that they were relying upon the advice and counsel of their own lawyers and executives to protect Pentech's best interests. Furthermore, "a party's knowledge is not superior where the relevant information 'was

17

either a matter of public record, was not pursued by plaintiffs, or was disclosed at least in part . . . .'" *Grumman*, 748 F.2d at 739 (quoting *Aaron Ferer & Sons*, 731 F.2d at 123). In light of the undisputed evidence establishing Pentech's access to Par, its attorneys, and the settlement documentation, as well as Pentech's reliance on outside counsel and its board members' independent business judgment, the Court finds the claim that Par owed a fiduciary duty to Pentech to be without merit. The parties' contract disclaimed such a duty, or at a very minimum, bore no objective evidence of an intent to create such a relationship, as is typically needed under New York law. Pentech dealt with Par at arm's length, and was not subject to extraordinary control by Par. Pentech may not have had "unlimited access" to Par and its lawyers in the sense of being privy to every single conversation relating to settlement (an issue, which, in any event, the Court need not decide here, as it goes more to the breach of contract claim, not the breach of fiduciary duty claim, and is not material to the result herein). Yet Pentech had sufficient access to make an informed, independent decision about settling the case. Therefore, the Court grants Par's motion for summary judgment on the breach of fiduciary duty claim and respectfully dismisses that claim from the case.

II.   Count IV - Accounting

Under New York law, to sustain an action for an accounting, a party must establish four elements: "'(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.'" *Dayan Enterprises, Corp. v. Nautica Apparel, Inc.*, No. 03 Civ. 5706 (LLS), 2003 WL 22832706, at *1 (S.D.N.Y. Nov. 26, 2003) (quoting *Pressman v. Estate of Steinvorth*, 860 F. Supp. 171, 179 (S.D.N.Y. 1994)). Under New York law, "an equitable accounting is available only if there exists a

18

fiduciary or trust relationship between the parties." *Bogil v. Fidelity Management Trust Co.*, No. 88 CIV. 7875 (RPP), 1989 WL 46653, at *3 (S.D.N.Y. April 27, 1989) (internal quotation marks and citation omitted); *accord, e.g., Adam v. Cutner & Rathkopf*, 656 N.Y.S.2d 753, 759 (N.Y. App. Div. 1997) ("The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship . . . .") (internal quotation marks and citation omitted). Because the Court finds that there was no fiduciary relationship between the parties, it follows that Pentech's claim for an accounting also must fail. The Court therefore grants Par's motion for summary judgment on this claim as well.

## CONCLUSION

For the reasons given above, Par's motion for summary judgment on Count III and Count IV is granted.

So ordered.

*/s/ Mark Filip*
Mark Filip
United States District Judge
Northern District of Illinois

Date: 10/25/07