**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PENTECH PHARMACEUTICALS, INC.,** | ) | |
| **an Illinois corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 04 C 3149** |
| | ) | |
| **PAR PHARMACEUTICAL, INC., a** | ) | **Magistrate Judge Morton Denlow** |
| **Delaware corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a claim for breach of contract and declaratory judgment brought by Plaintiff Pentech Pharmaceuticals, Inc. against Defendant Par Pharmaceutical, Inc., arising out of a contract between them relating to a generic version of Paxil.  The Court conducted a bench trial on December 9-12 and 15-16, 2008 and heard closing arguments on December 22, 2008.  The Court has considered the testimony of the witnesses who testified at the trial, the deposition excerpts of the witnesses who were not available to testify in person, the parties' trial exhibits, the stipulations made by the parties, the proposed findings and conclusions submitted by the parties, and the closing arguments of counsel.

The following constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions

of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

## I. ISSUES PRESENTED

1.      Whether Section 2.3 or Section 5.2 of the First Amendment to the Supply and Marketing Agreement applies to the dispute.

ANSWER:    Section 2.3.

2.      Whether the License and Supply Agreement between Par and GlaxoSmithKline is part of a settlement to which Pentech is a party.

ANSWER:    Yes.

3.      How much is owed to Pentech from Par arising out of the First Amendment to the Supply and Marketing Agreement.

ANSWER:    $49.5 million.

4.      How much prejudgment interest is owed to Pentech from Par.

ANSWER:    $20,455,476.

## II. FINDINGS OF FACT

### A.      The Parties

1.      Pentech Pharmaceuticals, Inc. ("Pentech" or "Plaintiff") is an Illinois corporation with its principal place of business in Illinois. Pentech is in the business of

2

developing generic pharmaceutical drugs for approval by the United States Food and Drug Administration ("FDA").  Pl. Agreed Facts ¶1, T. 106:22-107:1.[1]

2.      Par Pharmaceutical, Inc. ("Par" or "Defendant") is a Delaware corporation with its principal place of business in New Jersey.  Par has, at all relevant times, been engaged in the business of manufacturing, distributing and selling pharmaceutical drugs.  *Id.* ¶2.

3.      Par is the operating subsidiary of Par Pharmaceutical Companies, Inc., a publicly traded company listed on the New York Stock Exchange. *Id.* ¶3.

**B.      Paxil**

4.      In order to market a pharmaceutical drug in the United States, a company must first obtain FDA approval.  *Id.* ¶4.

5.      FDA approval of pharmaceutical drugs is obtained pursuant to a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA").  The NDA process applies to new or "brand" drugs.  The ANDA process applies to drugs that are therapeutically equivalent to existing "brand" drugs.  *Id.* ¶5.

---

[1]A copy of the Undisputed Portions Of Plaintiff's Proposed Findings of Fact and Conclusions of Law (hereinafter, "Pl. Agreed Facts ¶__") is Exhibit A to the Undisputed Portions of the Parties' Proposed Findings of Fact and Conclusions of Law, filed in this matter on December 18, 2008.  A copy of the Undisputed Portions of Defendant's Proposed Findings of Fact and Conclusions of Law (hereinafter "Def. Agreed Facts ¶ ___") is Exhibit B to the Undisputed Portions of the Parties' Proposed Findings of Fact and Conclusions, filed in this matter on December 18, 2008.  References to "T.__" are references to the Transcript of Proceedings in this case.  References to "___ Dep." are references to designations in deposition transcripts submitted to the Court.  References to "PX__" and "DX__" are references to Plaintiff's and Defendant's trial exhibits, respectively.  References to " Dkt.__" are references to docket entries.  The Court has provided selected citations to the factual findings.  These are intended to be representative citations and there may be other factual support in the record that is not specifically cited.

6.      Since 1993, SmithKline Beecham Corporation and affiliates ("GSK")[2] have manufactured and sold paroxetine hydrochloride ("paroxetine") under the trademark "Paxil" for use in the treatment of depression, among other things.   GSK owns patent rights concerning Paxil.  Paxil was approved by the FDA pursuant to an NDA, and is sold only in tablet form.  *Id.* ¶6.

7.      Paxil was enormously successful for GSK, generating billions of dollars of sales in the United States.  In 2000, 2001 and 2002, sales of Paxil in the United States by GSK and affiliates were approximately $1.8 billion, $2.2 billion and $2.2 billion, respectively.  *Id.* ¶7 and Def. Agreed Facts ¶4.

## C.      Efforts to Develop a Generic Version of Paxil

8.      After GSK launched Paxil, several generic drug companies launched efforts to develop a generic paroxetine competitor to Paxil that would not infringe GSK's patents on Paxil. Pentech was one such company.  During the 1990s, Pentech worked to develop a formulation of paroxetine that would be therapeutically equivalent to Paxil, but would not violate the Paxil patents.  Pentech worked to develop a formulation of paroxetine that would be different from Paxil in several significant respects.  First, although Paxil was a hard tablet, Pentech sought to develop its paroxetine product as a soft capsule.   Second, the active ingredient contained in Paxil is a hemihydrate (or "crystalline") form of paroxetine.  Pentech sought to develop an "amorphous" (*i.e.*, non-crystalline) form of paroxetine, which Pentech

---

[2]In January 2000, SmithKline Beecham Corp. and Glaxo Wellcome combined to form GlaxoSmithKline.

believed would not infringe GSK's paroxetine patents.  In 1997, Pentech was awarded a patent for a paroxetine composition that differed from GSK's.  In 1997, Pentech also submitted applications for two additional patents on paroxetine, and patents on these applications were ultimately awarded in 2003.  Pl. Agreed Facts ¶8 and Def. Agreed Facts ¶¶4-5.

9. In March of 2000, Pentech filed an ANDA with the FDA, seeking FDA approval to manufacture and distribute Pentech's form of paroxetine as a generic competitor to Paxil for the treatment of depression.  Specifically, Pentech sought FDA permission to manufacture and distribute paroxetine capsules in doses of 10 mg and 20 mg, whereas, Paxil was available in 10 mg, 20 mg, 30 mg and 40 mg dosages.  Pl. Agreed Facts ¶9 and Def. Agreed Facts ¶¶6-7.

10. Another company, Apotex, had previously filed an ANDA for a generic tablet version of paroxetine.   Under 21 U.S.C. § 355(j)(5)(B)(iv) ("Hatch-Waxman Act"), Pentech's ANDA had "first-to-file" status with respect to a capsule form of generic paroxetine.  Pl. Agreed Facts ¶10 and Def. Agreed Facts ¶8.  As a consequence of its first-to-file status, Pentech had a potential opportunity to be the sole generic alternative to Paxil on the market for at least 180 days after the FDA approved its ANDA.  The filing of this "first filed" ANDA meant, under the rules of the Hatch-Waxman Act, that if Pentech could actually succeed in (i) manufacturing the amorphous capsule product specified in its ANDA, (ii) defeating any patent-infringement challenges from GSK, and (iii) gaining FDA approval, Pentech could be entitled to a 180-day "exclusivity period" after the launch of its

product during which no other company would be permitted to bring a similar paroxetine capsule product to market as a generic competitor, although this would not prevent a generic tablet paroxetine competitor from entering before or during this 180-day period. T. 107:17-108:5; 124:10-125:6. *See, e.g., Mylan Pharm., Inc. v. U.S. Food and Drug Admin.*, 454 F.3d 270, 273 (4th Cir. 2006) (describing significance of first-to-file status).

11.     Because it had not received an "AB rating" from the FDA, without which it could not be automatically substituted by pharmacists for a Paxil prescription, the success of the Pentech capsule product would be largely dependent on Pentech being first to enter the market against GSK's branded Paxil. DX 81 at 3; DX 72 at W462; T. 307:14-21, 308:9-14.

## D.     The GSK Litigation Against Pentech

12.     On May 11, 2000, shortly after Pentech filed its paroxetine ANDA, GSK commenced suit against Pentech in the United States District Court for the Northern District of Illinois, Case No. 00 C 2855. On September 22, 2000, GSK commenced a second suit against Pentech in the same court (Case No. 00 C 5831), and the cases were consolidated. The two cases (collectively, the "GSK Litigation" or "Paragraph IV Litigation") asserted patent infringement claims relating to Pentech's ANDA for paroxetine. In each of the cases, GSK alleged that it was the owner of a patent (Patent Nos. 4,721,723 and 6,080,759), and, in each case, GSK sought orders prohibiting any approval by the FDA of Pentech's paroxetine hydrochloride drug product, and enjoining Pentech from the commercial manufacture, use or sale of its paroxetine hydrochloride drug product. Pl. Agreed Facts ¶11,

Def. Agreed Facts ¶9.  This was Pentech's first involvement in Paragraph IV litigation.  T. 344:20-24.

**E.    Negotiations Leading up to the 2001 Supply and Marketing Agreement**

13.    Par is a major generic drug company that has marketed a number of highly successful generic drugs. T. 721:15-722:13.  As an important part of its business plan, Par frequently entered into agreements with third parties with respect to the development of new products and technologies.  Def. Agreed Facts ¶10.  In particular, Par was interested in acquiring the opportunity to market a version of paroxetine hydrochloride that would not infringe GSK's patents and which would enable it to enter the generic Paxil market before other generic makers came to market.  Pl. Agreed Facts ¶12.  In 1998, Par had entered into a contract with Genpharm that gave Par the exclusive right to market a paroxetine tablet that Genpharm was working to develop, should Genpharm ever succeed in developing and obtaining FDA approval for that product.  DX 59; T. 648:16-649:13.  As explained by Par Chief Executive Officer Scott Tarriff ("Tarriff"), Par had significant experience in partnering with ANDA filers and conducting the related patent litigation, which was an important part of Par's "business plan."  PX 43, p. PH 41781; T. 509:25-512:5.  Tarriff made it a point to keep himself informed and personally involved in Par's litigation matters.  T. 512:6-20.

14.     By late summer 2001, Pentech was in need of additional cash to fund its substantial ongoing litigation and development expenses.  T. 282:9-285:22; DX 62.  Pentech sought a partner who could provide financial support for its ANDA.  DX 72; T. 128:4-129:19; 287:8-12; 298:16-21; 304:15-306:5.  In addition, as a product development company, Pentech did not have any marketing or sales capability and had never manufactured a commercial product or marketed a pharmaceutical product.  T. 180:20-181:5; 306:6-12.  Pentech did not have a commercially reliable manufacturing source.  T. 298:1-21.  There were three primary stages to the manufacturing process: 1) receipt of the active pharmaceutical ingredient ("API"); 2) encapsulation of the API; and 3) filling the capsule.  T. 176:21-177:21.

15.     Given Pentech's financial situation and its lack of marketing capability, Pentech began looking for a top-tier generic company that could provide financial support and the ability to successfully market and sell generic products.  DX 72; DX 81; T. 285:18-286:23; 309:2-310-11.  The speed at which Pentech could bring its products to market was very important to its financial success.  T. 308:5-309:12; DX 81.

16.     In September 2001, Tarriff and Pentech's President Albert Hummel ("Hummel") began negotiating the business terms of a potential agreement under which Par would make an investment in Pentech's ANDA.  Pl. Agreed Facts ¶13.  Because airline travel was difficult in the wake of September 11, 2001, initial negotiations were by telephone.  T. 129:13-19; 159:21-23.  Pentech provided Par with a confidential memo outlining its business and litigation strategy regarding Pentech's ANDA.  DX 73; T. 130:7-

8

135:11; 324:8-326:19. Because Pentech's ANDA covered only capsules, the initial scope

of the proposed relationship was limited to capsules. The primary goal of that relationship

was to bring Pentech's product to market either through a victory or favorable settlement in

the ongoing Paragraph IV Litigation with GSK. DX 1 at 1 (recitals); T. 348:17-349:7;

380:2-14; 758:13-20.

17.     On September 24, 2001, Tarriff sent a letter to Hummel proposing the

following:

> Par provides $200,000 at contract signing, $200,000 at final
> FDA approval, and $200,000 at a successful lower court
> (District Court) decision for a total of $600,000 in payments.
>
> Par will be responsible for all legal costs up to the first
> $2,000,000 associated with supporting the paragraph IV
> litigation. In the event legal costs exceed $2,000,000 the
> expenses will be shared 70% by Par and 30% by Pentech. The
> case will be transferred to Frommer, Lawrence and Haug. Par
> will not reimburse Pentech for previous litigation costs.
>
> Par will be responsible for all sales, marketing, shipping,
> distribution, billing and pricing of the product.
>
> Par will receive 70% of gross profit generated by the sale of the
> product. In the event Par/Pentech is marketing the only generic
> version of paroxetine the profits will be split equally.

PX 20; T. 145:4-147:7; 152:6-152:17. Tarriff viewed Paxil as a big business opportunity

worth potentially $100 million to which Par would provide several million dollars and

excellent sales and marketing capability. T. 720:14-722:2.

18.     While these negotiations were in progress, Tarriff disclosed to Hummel that

Par was under a contractual obligation with another company to sell a generic paroxetine

tablet that was the subject of an ANDA, should that tablet ever be approved by the FDA.  T. 162:24-164:10; 310:12-311:3; 723:3-7.  At some point much later, in or around 2003, Pentech learned the name of the company was Genpharm.  T. 164:11-21.

19.  During these negotiations, the parties exchanged drafts of a Supply and Marketing Agreement for review and comment by the parties and their respective outside counsel.  T. 158:21-159:6; 397:12-17; DX 33 at 14 (interrog. 2); DX 77; DX 80.

20.  Both parties and their counsel are sophisticated and experienced with contracts. Par has entered into many licensing agreements with companies other than Pentech. Pentech's CEO Hummel, and its Chairman, James D. Lumsden ("Lumsden"), are experienced in contracting, pharmaceutical investment, and corporate relationships.  T. 104:10-24; 110:22-111:11; 794:1-8; 810:8-15.

21.  According to Hummel, Tarriff assured him that Genpharm's paroxetine tablet was stuck in litigation, was behind a "first to file" ANDA filed by Apotex, and that Pentech's capsule product would get to market earlier.  T. 164:22-165:6; 170:4-171:24.  When Hummel learned of Par's tablet agreement, he asked Tarriff to add a provision to the prospective contract between Pentech and Par that would entitle Pentech to a share of any sales of Genpharm's tablet in the event the Pentech capsule was on the market and Par thereafter started to market the tablet.  T. 162:24-165:20.

**F.  The 2001 Supply and Marketing Agreement**

22.  On or about November 19, 2001, Pentech and Par entered into an agreement titled Supply and Marketing Agreement Between Pentech Pharmaceuticals, Inc. and Par

Pharmaceutical, Inc. ("the 2001 Agreement").  Pl. Agreed Facts ¶14; PX 29; DX 1.  By this time, Pentech had invested approximately $7 million in the paroxetine capsule project.  T. 144:12-15.

23.     Under the 2001 Agreement, Par received the exclusive right to distribute Pentech's paroxetine capsule, should Pentech ever obtain FDA approval for the product, and agreed to purchase all of its requirements for paroxetine capsules from Pentech, to the extent Pentech was able to meet its supply needs.  DX 1 § 3.1.

24.     Pentech maintained the responsibility under the agreement for completing the development and regulatory approval process and for ensuring the manufacture and supply of paroxetine capsules to Par. DX 1 § 3.1; T. 315:20-316:19.

25.     The 2001 Agreement incorporated each of the terms outlined in Tarriff's September 24 letter.  It provided, among other things, for Par to pay up to $600,000 in three incremental "milestone" payments to Pentech upon Pentech achieving certain benchmarks. DX 1, § 2.1.  In addition, Par agreed to finance part of the cost of Pentech's paroxetine project and the defense of the GSK Litigation.  *Id.* § 2.2.  In exchange, Par received the exclusive right to sell, market and distribute Pentech's capsule, and the right to control the defense of the GSK Litigation.  *Id*. §§ 2.1 and 2.2.  Pentech's principal obligation under the 2001 Agreement was to manufacture paroxetine capsules and sell them to Par.  *Id*.

26.     The parties understood that Par's primary contribution to the project would be Par's marketing and distribution efforts.  Under the 2001 Agreement, Pentech would develop and supply the product, and Par would market it.  T. 321:14-322:8; 721:15-722:2.

27.    The 2001 Agreement included the following provisions, among others:

(a)    The "Product" was defined by reference to Exhibit A to the agreement, which included four references to a "capsule" product and none to a "tablet" product.  PX 29, Article 1 & Ex. A.

(b)    Section 2.2 provided that Pentech's defense in the GSK Litigation would be conducted under the guidance of new counsel designated by Par:  Frommer, Lawrence & Haug, LLP ("FLH").  Pl. Agreed Facts ¶15.  Section 2.2 further provided that Par would have ultimate decision-making authority with respect to the GSK Litigation. PX 29, § 2.2.

(c)    The 2001 Agreement made no provision for the consequence of a settlement of the GSK Litigation.  Section 2.3 provided, however, that Pentech and Par would both need to agree to any such settlement.  Specifically, Section 2.3 provided:

> Any Paragraph IV Litigation or any other litigation regarding the ability of Par to market the Product brought by a third-party against Par or Pentech shall only be settled upon the mutual satisfactory approval of Par and Pentech. Each of Par and Pentech hereby agree that it will not unreasonably withhold such approval if such approval is requested by the other party.

PX 29, § 2.3.

(d)     Section 3.1 set forth terms governing the manufacture and supply of the Product "[u]pon final FDA regulatory approval granting Pentech the right to manufacture, sell and distribute the Product." Pentech agreed to supply Par's reasonable requirements for the Product. Pl. Agreed Facts ¶15(c).

(e)     Section 3.5, titled "Sales and Marketing," provided that, "[s]ubject to Section 3.1, Par shall be the exclusive seller of the Product to third-parties in the Territory." PX 29, § 3.5.

(f)     Article 5 was entitled "PAYMENT FOR THE PRODUCT." That Article began with Section 5.1, which provided: "Payment for the Product shall be made by Par, on the terms and conditions set forth herein, and shall consist of (i) the Transfer/Contract Price for the quantity of Product delivered by Pentech to Par pursuant to a Firm Order (the "Transfer/Contract Price Payment") and (ii) as more fully described in Section 5.2 hereof, a percentage of the Gross Profit generated from the sale by Par of any Product (the "Profit Payment"). Section 5.1 defined the "Transfer Contract Price" as "Pentech's actual cost of manufacture plus Pentech's internal burden rate." PX 29, § 5.1.

(g)     Section 5.2 provided that "[i]n addition to the Transfer/Contract Price Payment and subject to Section 3.1," Par would pay Pentech "Profit Payments" on sales of the "Product" at varying percentages of "Gross Profits," depending on whether there was generic paroxetine competition on the market.  PX 29, § 5.2(A), (B).

(h)     Subsection 5.2(C) addressed Hummel's concerns expressed to Tarriff about the possibility that Par would sell both the Pentech capsule and a competing generic tablet form of paroxetine, stating:

> To the extent that Par is marketing *both* a capsule and tablet generic version of the Product, the Profit Payment on the capsule version of the Product shall be as set forth in Subsection 5.2(B) above.  In addition, a Profit Payment on the tablet version of the Product shall be paid by Par to Pentech in an amount equal to 15% of Par's gross profit generated by the sales of the tablet version of the Product.

PX 29, § 5.2(C) (emphasis added).  Pentech sought to protect itself against the possibility that Par would shelve Pentech's capsule product and come to market with the tablet product also under development.  T. 162:24-165:20; 1080:4-1085:8.

(i)     Section 5.3 provided that the initial Profit Payment would be paid within 75 days "after the launch of the Product by Par," and that  "*[t]hereafter*, payment of the Profit Payment for the Product *and the tablet version of the Product, if applicable*, shall be made within ten (10) days of the end of each calendar month."  PX 29, § 5.3(B) (emphasis added).

28.     There is some dispute as to whether the defined term "Product" refers specifically to Pentech's capsule version of paroxetine.  The parties agree that the capsule

form of paroxetine was the only form covered by Pentech's ANDA. T. 168:2-15; 541:16-18.

Numerous provisions throughout the 2001 Agreement make sense only if the "Product" is understood to refer to the Pentech capsule. (*E.g.*, PX 29 (third, fourth and fifth "whereas" clauses), § 4.1.) In several places, the agreement refers to the tablet "form," or tablet "version" of the "Product." The Court finds, based on the text of the agreement and the circumstances surrounding its execution, that the defined term "Product" referred to Pentech's capsule except in those instances in which the Agreement expressly provides otherwise through use of the phrase "the tablet version [or "form"] of the Product."

## G.    Circumstances Leading to the 2002 Amendment

29.    The parties entered into discussions starting in the summer of 2002 to amend the 2001 Agreement. As with the 2001 Agreement, the essential business terms of the amendment were negotiated by Tarriff and Hummel. At some point, Par's Vice President Paul Campanelli ("Campanelli") became involved in the efforts to draft an agreement consistent with those negotiated terms. T. 210:18-211:7; 887:20-22.

30.    By April 2002, Pentech had made requests to Par to increase its financial commitment to the project. In particular, Hummel asked Tarriff to provide an additional $5 million of funding from Par to Pentech. DX 177 at FS38; T. 455:15-456:6; 825:2-7. Those efforts by Hummel were unsuccessful. Par did not commit to invest any additional money in the project in April, May, or June of 2002. T. 824:7-826:4.

31.    Meanwhile, in May 2002, Pentech began discussions with GSK to settle the Paragraph IV Litigation. DX 158 at P86432; DX 33 at 5 (interrog. 1).

15

32.     One factor that precipitated the amendment was that the parties became aware that the costs of the GSK Litigation would exceed Par's funding commitment under the 2001 Agreement, and Pentech also needed assistance to develop its capacity to manufacture its paroxetine product.  Pl. Agreed Facts ¶18; PX 182; DX 99.  In particular, the parties determined that Par would assume from Pentech responsibility for developing and manufacturing the capsule, and obtaining FDA approval of the ANDA.  As a result, the parties anticipated that Par would invest approximately $9 million more than previously expected, including, among other things, roughly $4 million in raw material costs, $2.5 million to prepare Pentech's Chicago facility for manufacturing of solid dispersion and $500,000 to expand Par's own manufacturing facilities.  PX 43; T. 180:3-181:23.  In addition, Par determined there were significant problems with all three components of the manufacturing process, including the relationship with the manufacturer of Pentech's ASI, Pentech's production capacity and the manufacturer for the encapsulation stage.  T. 733:3-737:16.

33.     At the same time, the parties perceived that the financial risk and the possible return on the project had increased.  T. 586:20 - 587:2.  As Tarriff explained to Par's board of directors, "the financial value of the opportunity is greater than first assumed."  PX 43.

**H.     Settlement Offers From GSK**

34.     Among the additional events that precipitated the amendment to the 2001 Agreement were two settlement offers from GSK.  Following a meeting between representatives of Pentech and GSK in June, 2002, GSK made the first offer in July 2002 at

16

an informal meeting in Newark, New Jersey, between GSK's counsel and Pentech's counsel James Rubin ("Rubin"). T. 183:7-191:12; Rubin Dep. 68:25-71:14. Rubin related GSK's offer to Hummel, who determined that the value of the product offered by GSK was so insignificant that he instructed Rubin to reject the offer immediately. T. 187:20-190:15. Soon thereafter, Hummel informed Tarriff for the first time that Pentech was having settlement discussions with GSK. T. 560:21-562:13. There is conflicting testimony as to the substance of these various communications regarding the GSK settlement offer. According to Hummel, he told Tarriff that GSK had offered to settle by supplying Pentech with a small quantity of paroxetine product that could be marketed as a treatment for depression, as well as the use of paroxetine active pharmaceutical ingredient ("API") for treatment for premature ejaculation ("PE"). T. 186:13-20; 190:16-191:2. Tarriff claims, however, that he recalls Hummel describing the GSK offer as a $5 million payment to acquire Pentech's patents for paroxetine as a treatment for PE. T. 560:21-561:5; 739:13-741:4. Rubin recalls, consistent with Hummel's testimony, that GSK offered to provide a supply of paroxetine that could be marketed for depression. Rubin Dep. 68:25-71:14; PX 46; T. 1024:13-1026:25.

35.     Hummel was disappointed by what he perceived to be a very meager settlement offer from GSK; however, Tarriff reacted positively upon being told of the GSK offer. T. 192:13-193:2. Hummel recalls that Tarriff was encouraged by GSK's proactive conduct and interest in settling, and was optimistic that Par and Pentech would be able to settle with GSK if Par and Pentech could expand production capacity for the Pentech capsule. T. 194:12-

17

196:13; 407:9-408:2. Tarriff did have a concern that Pentech could negotiate a lucrative settlement for itself, while leaving Par "holding the bag." T. 583:7-584:6; 740:23-741:4.

36.     Hummel and Tarriff negotiated two major issues: 1) an increased investment by Par in the effort to manufacture a paroxetine capsule, and 2) an agreement regarding the division of profits arising out of a possible settlement with GSK. Regarding the first point, Par agreed to invest additional sums and take on additional responsibility in exchange for a greater share of the profits. With respect to the second issue, the parties agreed that in the event of a settlement, Par would recover its direct costs and split profits 60% to Par and 40% to Pentech. T. 198:9-201:8; 421:5-423:10. The Court finds that there was never any discussion in the negotiations limiting amended Section 2.3 to a cash settlement payment from GSK. T. 236:4-237:5. The amendment to the 2001 Agreement was the first time the parties made any agreement as to a particular percentage split of settlement proceeds. T. 411:15-20.

37.     Campanelli recalled Hummel informing Par in the late summer or early fall of 2002 that GSK made an offer to Pentech or Pentech's attorney in which GSK offered 100 kilograms of paroxetine tablets, which had a sale value of approximately $5 million. T. 884:2-887:13. He also recalled the quantity of the tablet offer was based on GSK's assessment of Pentech's manufacturing capacity. *Id.*

38.     On August 2, 2002, just days after his conversation with Hummel, Tarriff sent a letter to Hummel proposing a revision to the 2001 Agreement. DX 99. In the letter, Tarriff noted that "the amount of work and expense" necessary to get Pentech's paroxetine capsule

18

to market was "far greater than originally forecasted." Tarriff stated that Par was prepared to take on the additional responsibility and expense necessary to "fund the project to the level necessary to commercialize the project," but that Par would require two modifications to the existing 2001 Agreement. First, Tarriff stated that Par's share of the profits resulting from marketing Pentech's capsule "be increased from 70% to 75% and include time in which Par is the sole marketer of paroxetine, other than GSK." The second modification that Tarriff sought was an agreement that, in the event of a settlement affecting the ANDA, "Par would be reimbursed for all of its expenses," after which the remaining "settlement funds would be split 60% to Par." DX 99; T. 575:23-578:16. The first of these modifications was reflected in the changes that were ultimately made to the parties' capsule sales profit splits under Section 5.2. The second modification outlined in Tarriff's letter was reflected in the parties' addition of a second paragraph to Section 2.3. PX 66. The 2002 Amendment addressed the possible GSK settlement and the significant additional investment and responsibility being assumed by Par. T. 198:9-2001:8; 380: 9-19; 576:6-577:17. Par believed it needed to take more control if the project was going to be successful. T. 566:1-567:11.

39. On August 7, 2002, Tarriff wrote an internal memorandum to Par's board of directors describing the situation with Pentech and seeking the board's approval for an additional investment in the Pentech paroxetine project. PX 43. Tarriff described the Pentech paroxetine opportunity as "far greater than first assumed," but cautioned that the project would "require a far greater investment than originally projected." Tarriff also stated: "From a litigation standpoint, paroxetine provides a better likelihood of success than Par's

other first to file opportunities, with the exception of megestrol." Tarriff told Par's board that "[t]hese opportunities are far and few between," and that pursuit of the opportunity represented "a prudent risk with the right risk/reward profile." Tarriff recommended that Par "continue to aggressively pursue this undertaking." *Id.*; T. 586:1-589:21.

40.     On August 7, 2002, Tarriff received a memo from Par's Vice President of Engineering and Manufacturing Operations, Bill Bundenthal, and Executive Vice President of Scientific and Regulatory, Robert Fernia, concluding that the capsules can be "safely and efficiently manufactured" at Pentech's facility and that they were "confident that the process of facility renovation process improvement and procurement of all necessary permitting can be accomplished by June of 2003 in time for launch." PX 44.  Par was ready to proceed on two possible tracks: a settlement track and a litigation/manufacturing track.

41.     On September 4, 2002, GSK's counsel, Ken Frankel, made a second settlement offer, this time to FLH attorney Robert E. Colletti.  GSK proposed to settle the litigation by Pentech conceding infringement in exchange for GSK supplying Pentech with a limited quantity of GSK's paroxetine tablets (100 kilograms per year) and a license authorizing Pentech to sell those tablets for the treatment of depression.  This settlement offer was described in a memorandum written that day by Colletti.  PX 46.  There is no reference to a possible cash offer from GSK.  Pentech's former attorney, Rubin, testified that this offer was the same as the offer that he recalled GSK had made in Newark earlier in July.  Rubin Dep. 70:12-71:14.

42.     That same day, Tarriff sent FLH attorney Ed Haug an e-mail in which he: (a) calculated the value of GSK's offer to be approximately $4 million; (b) confirmed that he had directed Hummel to "have all settlement conversations flow through FLH";  and (c) directed FLH to prepare a "revised contract" between Pentech and Par.  PX 47.  Tarriff explained that the $4 million referenced in his e-mail was believed to be the value of the 100 kilograms of paroxetine contained in Colletti's September 4 memorandum.  PX 46; T. 594:6-9.  There was no reference to a cash offer in the memorandum.  PX 46; T. 594:10-17.  The product quantity term of GSK's offer was based on GSK's understanding of Pentech's then current capsule manufacturing capacity.  Tarriff sought an amendment to the 2001 Agreement in order to control the settlement with GSK and to make sure Pentech could not sell out Par.  T. 595:9-13.

43.     Both parties knew at least two months before executing the amendment to the 2001 Agreement that GSK had proposed to settle the litigation by, among other things, providing a license and supply of paroxetine tablets for treatment of depression.  *See, e.g.,* PX 46 and 47.  The parties adopted the broad language in Section 2.3 because they did not know what the precise terms of a settlement might be with GSK and a settlement with GSK would be favorable to both Par and Pentech.  T. 218:12-220:17; 433:11-436:19.

44.     In sum, at the time of the execution of the 2002 Amendment, two events were underway—efforts to prepare for the prospective settlement with GSK on the one hand, and efforts to increase capsule production capacity on the other hand.

## I.     The 2002 Amendment

21

45.     Par's counsel prepared drafts of the 2002 Amendment for review by Par. PX 49-51. In none of those drafts or in the communications between Par and its counsel, is there any indication that amended section 2.3 was to apply only to a cash settlement. Campanelli sent the proposed 2002 Amendment to Hummel on September 20, 2002. PX 54. A further revision was sent to Hummel by Campanelli's assistant on October 22, 2002. PX 57. Once again, nothing in either transmittal indicates any intention to limit the broad language contained in amended section 2.3 to a cash settlement with GSK.

46.     On or about November 12, 2002, Hummel and Tarriff executed the 2002 Amendment. Pl. Agreed Facts ¶20. (Hereinafter, the 2001 Agreement, as amended by the 2002 Amendment, is referred to as the "Contract.") The Court finds Hummel's explanation of the purpose of amended Section 2.3 to be credible and rejects as not credible the explanations provided by Tarriff and Campanelli. The explanation provided by Hummel is consistent with the language of amended Section 2.3.

47.     The 2002 Amendment (DX 2) included the following provisions:

(a)     Amended Section 2.2 gave Par "sole and exclusive control" of the GSK Litigation, and "full responsibility" for all regulatory activities for the paroxetine capsule product, and assigned Par project management responsibility for the project. DX 2 §§ II. A, C. This represented a substantial increase in Par's responsibilities. T. 606:13-607:12.

(b)     The 2002 Amendment significantly increased Par's financial investment in the project in the range of $10 million to $14 million. DX 2 §§ II. A, C; T. 577: 10-17; DX 99; PX 43 at PH 41779.

22

(c)    A second paragraph was added to Section 2.3 of the 2001 Agreement concerning the division of proceeds from a settlement.  As amended, Section 2.3 provided, in its entirety as follows (text added by the 2002 Amendment *in italics*):

> 2.3    <u>Settlement</u>. Any Paragraph IV Litigation or any other litigation regarding the ability of Par to market the Product brought by a third party against Par or Pentech shall only be settled upon the mutual satisfactory approval of Par and Pentech.  Each of Par and Pentech hereby agree that it will not unreasonably withhold such approval if such approval is requested by the other party.
>
> *Par and Pentech further agree that in the event of any settlement to which Pentech and a third party are parties, which relates to paroxetine, Par will first be reimbursed for all of its direct costs relating to the development and marketing of paroxetine, including but not limited to manufacturing related costs (e.g. spray drying equipment, facility modifications and API start-up costs) and legal expenses, out of any amounts received in the settlement by Par and Pentech, any remaining amounts that are received by Par and Pentech out of such a settlement will be divided 60% to Par and 40% to Pentech.*

(d)    The parties added Section 2.4, which provided, among other things, for Par to "have sole decision-making control over the project" and for Par to reimburse Pentech for up to $1.3 million in "corporate costs" incurred in 2003.  DX 2, § II. C. T. 607:13-608:9.

(e)    A new Section 5.2 was substituted for existing Section 5.2, providing an increased share of profits to Par, and provided in its entirety as follows:

> 5.2    <u>Profit Payment</u>.  In addition to the Transfer/Contract Price Payment and subject to Section 3.1 hereof, Par shall pay Pentech the following Profit Payments:
>
> > (A)    Subject to Section 3.1, during the Term and any Renewal Term, the Profit Payment to be paid by Par to

23

Pentech shall equal 25% of the Gross Profit generated by Par from sales of capsule paroxetine product.

(B) To the extent Par markets a generic tablet version of paroxetine, during the Term of this Agreement and any Renewal Term, Par shall pay to Pentech a Profit Payment in the amount of 15% of Par's gross profit generated by sales of the tablet version of paroxetine. Par's gross profit generated by the sales of the tablet version shall be calculated using the same methodology as set forth herein for calculating the Gross Profit for sales of the capsule and shall include as a "Cost of Goods" any license, royalty, profit or similar payment required to be made by Par to a third party in connection with Par's sale of the tablet version of the paroxetine as well as any payments similar to the Transfer/Contract Price Payment, which are made to a third Party in connection with the tablets.

(f)     Section 5.3 of the Supply and Marketing Agreement was not changed by the 2002 Amendment. Pl. Agreed Facts ¶21.

**J.     Settlement Of The GSK Litigation**

48.     Subsequent to the execution of the 2002 Amendment, Par and its counsel, FLH, on Pentech's behalf, entered into settlement negotiations with GSK concerning the resolution of the GSK Litigation. Par made a presentation to GSK in December 2002 in an effort to convince GSK to settle the GSK Litigation and to allow Pentech and Par to become GSK's generic partner for Paxil. DX 47; T. 220:20-228:15.

49.     At a meeting in January 2003, GSK, Par and Pentech reached an agreement in principle on the basic terms of a settlement of the GSK Litigation. T. 239:9-243:14. The substance of the agreement was that GSK would provide a supply of unbranded Paxil tablets

24

and a license to sell the tablets, and GSK would receive a portion of the tablet sales revenues. *Id*. GSK consistently refused to include a cash component in the settlement. T. 766:13-16; 482:2-24.

50.     That agreement in principle was thereafter modified at GSK's behest. T. 245:11-246:3. Hummel recalls that Tarriff called him on or about February 7, 2003, to inform him of the modifications to the deal. *Id*. According to Hummel, he and Tarriff discussed the financial impact that the modification would have on Pentech and, in particular, how the diminished short term value of the settlement would affect Pentech based on the Par/Pentech 60/40 settlement split. T. 248:5-23.

51.     On February 8, 2003, Par's board of directors met telephonically and approved the proposed settlement. Pl. Agreed Facts ¶22.

52.     On February 8, 2003, Pentech's board of directors also met telephonically to approve the proposed settlement. DX 130. No one from Par attended this meeting. Pentech's board authorized Hummel to proceed with the settlement. Pl. Agreed Facts. ¶23. FLH attorney Ed Haug attended a portion of this meeting, during which Par's 60/40 split with Pentech was discussed. T. 250:12-251:1; 875:9-876:3.

53.     On February 24, 2003, two days before signing the GSK Litigation settlement, Tarriff wrote a letter to Asahi Glass Company—which had been Pentech's supplier of paroxetine API under the ANDA—in which he made the following settlement offer to Asahi: "Par will pay AGC 2% of the proceeds it receives under a settlement with GSK, after Par first recovers its costs for this litigation . . . ." PX 100. *See also* PX 104 and 115. The

language in Tarriff's offer to Asahi is similar to the language used in the amendment to Section 2.3 of the 2002 Amendment.

54.     Par, Pentech and GSK entered into a Settlement Agreement on February 26, 2003.   Contemporaneously with the execution of the Settlement Agreement and in consideration thereof, Par and certain GSK affiliates entered into a License and Supply Agreement.  Pl. Agreed Facts ¶24; PX 102, 103.  Pursuant to the Settlement Agreement, Par could market Paxil in packaging that did not use the Paxil name.  PX 179, ¶29.

55.     These documents were later revised.  On April 16, 2003, Pentech, GSK and Par signed an Amended and Restated Settlement Agreement (hereinafter, the "Settlement Agreement"); and GSK and Par signed an Amended and Restated License and Supply Agreement (hereinafter, the "License and Supply Agreement").  Pl. Agreed Facts ¶25; PX 116, 117.

56.     Par summarized the GSK settlement in a press release issued April 18, 2003, as follows: "The settlement will allow Par to distribute in Puerto Rico substitutable generic paroxetine hydrochloride immediate release tablets supplied and licensed from GSK for a royalty paid to GSK.  Par will be entitled to distribute the same product in the U.S. market once another generic version fully substitutable for Paxil becomes available there."  PX 120. Par began selling tablets in Puerto Rico in April or May, 2003.  T. 484:5-10.  Pentech never received any profit payments or accounting from these sales pursuant to Sections 5.2 and 5.3(B) of the 2002 Amendment.  T. 485:4-486:5.  This fact supports the conclusion that Par understood that Section 2.3, and not Section 5.3(C), applied.

26

57.     Pursuant to an order of the District Court in the GSK Litigation, both the Settlement Agreement and the License and Supply Agreement were submitted for Court approval on April 23, 2003.  After a hearing, the Court approved the settlement on May 2, 2003.  *SmithKline Beecham Corp. v. Pentech Pharmaceuticals, Inc.*, 261 F. Supp. 2d 1002 (N.D. Ill. 2003) (Posner, J.).  Pl. Agreed Facts ¶26.

58.     The Settlement Agreement provided:

> This Settlement Agreement, the License and Supply Agreement, and the Stipulations in the proposed Stipulated Order are the only consideration exchanged by on or on behalf of Plaintiffs or GSK, on the one side, and Pentech or Par, on the other side, in reaching the agreement to settle the Litigation.

*Id.* ¶27.

59.     In the Settlement Agreement, Pentech and Par admitted that the commercial manufacture of Pentech's paroxetine product would infringe one of GSK's patents that was due to expire in 2006, and further admitted that the patents were valid and enforceable.  PX 179, ¶¶ 3 and 31.  In return, GSK agreed to dismiss its lawsuits against Pentech and not to assert three other GSK paroxetine patents against the Pentech capsule.  DX 3, ¶¶7, 9.

60.     The License and Supply Agreement provided for Par to receive its entire requirement of unbranded paroxetine tablets from GSK, and gave Par permission to market those tablets in Puerto Rico starting immediately.  PX 117, §§ 4.1, 4.3(a); PX 120.  It further provided that, upon entry of a generic Paxil competitor into the United States, Par could immediately market the unbranded Paxil tablet throughout the United States.  PX 117, § 4.2;

27

PX 120. The License and Supply Agreement also required Par to make a "royalty payment" to GSK of 60 percent of its Net Sales of the tablet. PX 117, § 3.1.

61. The unbranded tablets provided to Par by GSK are identical in chemical composition to Paxil. PX 179, ¶34. Likewise, they are manufactured by the same manufacturer as Paxil, in the same doses and dosage forms, but without brand identification, and are marketed pursuant to the FDA's approval of GSK's NDA for Paxil. PX 129, pp. 17-18. The unbranded tablets, in contrast to the possible Pentech capsule, were subject to automatic substitution by pharmacists and available in all four strengths of the branded Paxil product. PX 129, § 4.1.

62. Although Par assumed control and responsibility over development of the Pentech capsule no later than the date of the 2002 Amendment, Pentech's ANDA has never been approved by the FDA. PX 179, ¶54.

## K.     Benefits of the GSK Settlement

63. Par and Pentech received substantial benefits from the GSK settlement. T. 669:3-675:6. A generic drug with an "AB" rating from the FDA is automatically substitutable by a pharmacist for the brand drug. A non-AB rated generic drug is not automatically substitutable. As a result, an AB rating for a generic drug is preferred from a marketing perspective. T. 140:19-141:9; 305:9-21; Tarriff Dep. 57:4-58:15. The parties expected that Pentech's capsule would not receive an "AB" rating. T. 672:7-9; Tarriff Dep. 57:4-18. In contrast, the paroxetine tablet that GSK supplied Par under the GSK Litigation

settlement was "AB" rated and fully substitutable for Paxil. T. 672:16-18; PX 129, pp. 17-18.

64.    Pentech's capsule was to be available for sale in only two dosages, 10 and 20 milligrams. In contrast, the GSK unbranded tablet licensed to Par is available in the same four dosages as Paxil. T. 153:22-154:3; 671:22-672:18.

65.    The timing of market entry is crucial to the commercial success of a generic drug. T. 736:6-8. At all relevant times, the timing of the market entry for the Pentech capsule was uncertain, because of the GSK Litigation and the fact that the FDA had not yet approved Pentech's ANDA. In contrast, under the Settlement Agreement, the GSK generic tablet—which also was manufactured by GSK, and was identical to Paxil except in name— would be immediately available for sale in unlimited volumes. T. 672:19-22.

66.    By reason of the foregoing, both Tarriff and Hummel understood that the potential market for the GSK tablet to be supplied by GSK under the settlement would be greater than the market for the Pentech capsule. T. 422:19-423:10; 671:22-673:16.

67.    On April 19, 2003, in an e-mail to Par's board of directors regarding the GSK settlement, Tarriff explained the various ways in which the settlement would reduce Par's risk, while increasing profitability. PX 122.

68.    It is clear that Par used Pentech's ANDA to negotiate a settlement that reduced the parties' risks (which, at that time, had largely been assumed by Par) while, at the same time, it increased the amount of the parties' potential reward and Par received significant benefits. T. 669:10-673:25.

29

**L.      "Interrelatedness" of The Settlement Agreement and the
License And Supply Agreement**

69.      The License and Supply Agreement between Par and GSK is part of a "settlement" to which Pentech is a party.  T. 710:5-8; 775:11-18.  The evidence is clear that all parties to the settlement consistently treated the Settlement Agreement and License and Supply Agreement as one unitary "settlement" of the GSK Litigation among Pentech, Par and GSK:

(a)      Both in their original form and as amended, the Settlement Agreement and the License and Supply Agreement were negotiated and executed at the same time by the same parties.  T. 665:14-24; PX 102, 103, 116, 117.  The settlement allows Par to distribute product.  T. 677:10-12.

(b)      The language of the contracts plainly describes the relationship between them.  For example, the Settlement Agreement expressly provides that the License and Supply Agreement is the consideration exchanged to settle the GSK Litigation. Pl. Agreed Facts ¶27.  Moreover, the License and Supply Agreement states in its first recital: "WHEREAS, the Parties wish to amicably settle patent litigation currently ongoing between them."  PX 117, p.1.

(c)      In a May 1, 2003 filing submitted to Judge Posner presiding over the GSK Litigation, GSK referred to the License and Supply Agreement as "*the core of its settlement* with defendant Pentech Pharmaceuticals, Inc. ('Pentech') and non-party Par Pharmaceutical, Inc. ('Par') . . . ."  PX 132 at 1; (emphasis added).

30

(d)     All parties consistently referred to the Settlement Agreement and the License and Supply Agreement collectively as the "settlement agreements" in the papers they filed in the GSK Litigation and in their oral representations to the District Court. *E.g.*, PX 127, p. 1; PX 128, p. 1; PX 129, p. 10; PX 130, p. 1; PX 131, pp. 1, 5; PX 171, p. 1.

(e)     Various court orders from the GSK Litigation refer to the Settlement Agreement and License and Supply Agreement, interchangeably, as the "settlement." PX 125; PX 140.

(f)     On April 18, 2003, Par issued a press release announcing that "*[t]he settlement* will allow Par to distribute . . . generic paroxetine hydrochloride immediate release tablets supplied and licensed from GSK for a royalty paid to GSK." PX 120 (emphasis added).

(g)     On April 21, 2003, Tarriff conducted a conference call with investors and pharmaceutical industry analysts to announce the settlement of the GSK Litigation. On that call, Tarriff described Par's exchange of the rights to Pentech's paroxetine capsule for the right to sell unbranded tablets under the License and Supply Agreement, as "trad[ing] up on draft day." PX 123; PX 124; T. 674:18-675:16.

(h)     Par's quarterly and annual reports filed with the Securities and Exchange Commission ("SEC") state that: "*[a]s a result of the settlement*, [Par] will be permitted to distribute . . . substitutable generic paroxetine hydrochloride immediate release tablets supplied and licensed from GSK . . ." PX 126, p. 2; "*[t]he settlement* allows Par to distribute . . . substitutable generic paroxetine . . . tablets supplied and licensed from GSK"

31

PX 142 , p. 19; PX 157, p. 34; (emphasis added) and that "Par has been granted the right *under the settlement* to distribute [GSK-supplied paroxetine tablets] in the United States . . . ." PX 168, p. 40 (emphasis added); T. 685:7-688:1.

(i)　　GSK's 2004 Annual Report referred to GSK's "settlement with Pentech and Par Pharmaceuticals to which Pentech had granted rights under Pentech's ANDA for paroxetine hydrochloride capsules," and stated "*[t]he settlement* allowed Par to distribute . . . paroxetine hydrochloride tablets supplied and licensed from [GSK] . . . ." PX 173, p. 117 (emphasis added).

(j)　　On October 24, 2003, Tarriff appeared on a CNBC television program and referred to Par's sales of the unbranded Paxil tablets as "a settlement from litigation." T. 681:12-682:18; PX 165 (19:45-24:34).

(k)　　On February 26, 2004, on a public earnings conference call, Tarriff stated: "Paxil was a settlement with GSK . . . we had first to file status in that, and that's how we settled that." PX 175 at P100695. Par settled the patent litigation with GSK "by becoming the authorized generic." T. 709:14.

(l)　　One of the benefits Par received out of the GSK settlement was the License and Supply Agreement with GSK. T. 661:25-662:11.

32

**M.    Par's Internal Communications Support this Court's Finding that Section 2.3
Governs**

70.    On March 12, 2003, Par's Vice President Paul Campanelli sent the following

e-mail to Dennis O'Connor, Par's Chief Financial Officer, and Joe Schott, Par's Senior

Director of Finance, with a copy to Tarriff:

> Two separate business terms were addressed in the Pentech
> amendment 1) legal expenses and 2) what happens in the event
> of a settlement.
>
> It is clearer if you read the contract and amendment together.  It
> is understood by Pentech, that #2 is in effect, we are in a
> Settlement.
>
> 1.    Legal Expenses:  Par is responsible for legal fees and
> expenses for P-IV litigation after November 2002.  Legal
> expenses in excess of $2 million is credited against profit.
>
> 2.    Settlement:  In the event of a settlement, Par is first
> reimbursed it [sic] direct costs related to marketing,
> manufacturing, facility modification, API and legal expenses out
> of amounts received in a settlement.  Remaining amounts
> received are split 60/40, Par taking the lion's share.

T. 923:14-926:1; PX 109.  Par's executives sent several responses to Campanelli's March

12 e-mail, none of which disagreed with the stated understanding that Pentech was to receive

a 40 percent share.  PX 106, 107,108, 110A, 110B, 111.

71.    Campanelli and Tarriff testified that these e-mail exchanges were meant to

relate only *Pentech's* understanding of the deal, an understanding with which they disagreed

at that time.  T. 924:2-16; 925:19-926:1; Tarriff Dep. 208:18-24.  This testimony is at odds,

however, with the text of the e-mails, which contain no expression or suggestion of

disagreement. The e-mail response from Tarriff (PX 107), to the contrary, suggested concurrence: "Paul, Joe, Also we get up to 3% of SALES for SG&A . . ." (Emphasis added.) Further, the circumstances and broader context suggest that Campanelli's March 12 e-mail was intended to provide information for Par's 2002 SEC Form 10-K, which was then being prepared. The e-mail is addressed to Par's Director of Finance Joe Schott ("Schott"), and Chief Financial Officer Dennis O'Connor ("O'Connor"), who were responsible for preparing the Form 10-K. *See* T. 926:21-927:11; PX 108; *see also* PX 58, 61, 63-65, 67-69, 73 (10-Qs demonstrating O'Connor and Schott's roles in preparing SEC filings). Par filed its 10-K on March 28, 2003, only two weeks after Campanelli's e-mail. PX 114. E-mail responses from Schott and O'Connor indicate that they understood the March 12 e-mail concerned the soon-to-be-filed 10-K report. PX 111 ("I think the current disclosure in the 10-K is correct because the settlement is not final"); PX 106 ("Shouldn't November 2002 be 2001, the signing date of the agreement?"). Campanelli acknowledged that, "from time to time, just in the ordinary course," he is asked to provide information that is needed for use in Form 10-K annual reports. T. 916:8-15. Consistent therewith is Campanelli's testimony that his March 12 e-mail merely identified and described two terms that had been changed by the 2002 Amendment. T. 925:14-926:1.

72. Before either Pentech or Par approved the settlement with GSK, Hummel advised Campanelli that Pentech understood it was to be paid a 40 percent share of the amounts Par derived from its sales of the unbranded paroxetine tablets from GSK. T. 917:5-919:11; 922:5-922:11; 990:7-991:8. Nevertheless, at no time before at least December 2003

did Par ever state to Pentech, either in writing or orally, that Pentech was entitled only to a 15 percent share.  T. 280:3-12.

73.    On May 5, 2003, Tarriff sent an e-mail to two Par employees asking them to prepare a complete list of all expenses related to Paxil to be sent to Hummel because "[w]e get our expense back."  PX 134.  This request is consistent with Section 2.3.

74.    On May 23, 2003, a Par employee, Michael McHugh, sent Par CEO Scott Tarriff an e-mail transmitting "files containing the 2003 & 2004 forecasts that include the changes we went over on Wednesday."  The attached spreadsheet shows that Par's "Gross margin %" in connection with the sale of paroxetine TABS was 24%.  T. 692:6-695:10; PX 149, pp. PB 7103, PB 7107.  This 24% figure is the percentage that would be derived from paying GSK 60% of net sales, and paying Pentech 40% of the remaining 40%, thereby leaving Par with 60% of 40%, or 24%.  T. 694:11-695:10.

75.    The purpose of Section 2.3, according to Tarriff's testimony, was to address a settlement proposal advanced by GSK in 2002.  T. 562:15-563:10.  Yet, the only settlement proposals advanced by GSK during 2002 were proposals for GSK to provide a supply of paroxetine for re-sale, precisely the settlement arrangement that GSK, Pentech and Par ultimately reached.  T. 710:9-18; PX 46; PX 47.  At trial, Tarriff testified that he understood those settlement offers to be "cash" offers (T. 594:10-24), but that testimony is inconsistent with his previous deposition testimony (Tarriff Dep. 141:4-18), which describes GSK's offer as having $5 million of "value", and also with the evidence showing that GSK offered a

tablet supply again in September 2002, and that Tarriff was immediately made aware of that offer. *See* PX 46, 47 (with references to "100 kg" of product).

76.     Tarriff testified that the parties anticipated they would probably have an opportunity to market paroxetine tablets from GSK. T. 532:25-533:18. Among other things, Tarriff testified "[i]t's pretty common that in all of your Paragraph IV litigation that ultimately you try to settle your cases." T. 533:2-4. When asked whether he told Mr. Hummel before the parties signed the Supply and Marketing Agreement that Par contemplated marketing a GSK tablet, Tarriff testified: "[n]o, but I think it was pretty common at that point that that's a frequent occurrence, and Mr. Hummel was and I think he still is, a board member of a large generic company in the U.S., and I think this is just something that's standard that happens pretty frequently." T. 533:14-18.

**N.     Amounts Par Obtained From Its Sales of Paroxetine Supplied by GSK Are "Amounts Out of Settlement" Under Section 2.3**

77.     On September 8, 2003, third party Apotex Inc. entered the United States market as a generic competitor to Paxil. As provided for in the License and Supply Agreement with GSK, Par immediately began selling generic paroxetine tablets manufactured by GSK, in competition with the Apotex product. Def. Agreed Facts. ¶19; PX 158; T. 697:14-698:11.

78.     The paroxetine tablet supplied by GSK under the settlement became Par's largest selling drug ever, as well as its second most profitable drug ever. Tarriff Dep. 238:5-21. As of September 30, 2007, Par's gross sales of paroxetine tablets exceeded $400 million.

36

T. 714:10-25. Pentech had no responsibility—financial or otherwise—relating to the marketing and sales of the GSK-supplied tablet. T. 417:5-8.

79. The language of the 2002 Amendment and extrinsic evidence demonstrate that the parties intended and understood that Pentech would receive a 40 percent share of Par's proceeds from its sales of unbranded paroxetine pursuant to Section 2.3. At the time the 2002 Amendment was executed, the parties were aware that the settlement with GSK might include the supply of tablets because GSK had rejected requests for cash payments. In light of this, the decision by the parties to select broad and all-inclusive language in the 2002 Amendment to Section 2.3 with the terms "any settlement," "any amount received in settlement," and "any remaining amounts that are received by Par and Pentech," the Court finds that the parties intended to treat the GSK settlement under Section 2.3, not Section 5.2.

## O. The Litigation

80. Beginning in or around September 2003, the dispute arose regarding whether Pentech was entitled to a 40 percent share of the amounts out of the GSK settlement. T. 267:8-276:3. At no time before at least December 2003 did Par ever state to Pentech, either in writing or orally, that Pentech was entitled only to a 15 percent share. T. 280:3-12. Pentech filed this lawsuit against Par on May 3, 2004. Dkt. 1. On March 28, 2006, Judge Filip denied the parties' cross-motions for summary judgment. Dkt. 202. On October 25, 2007, Judge Filip granted Par's motion for summary judgment on Pentech's breach of fiduciary duty and equitable accounting claims. Dkt. 231. Subsequently, this Court

conducted a bench trial on December 9-12 and 15-16, 2008 and heard closing arguments on December 22, 2008.

## III. CONCLUSIONS OF LAW

### A.    Jurisdiction and Choice of Law

81.    This action includes two counts: Count I for breach of contract; and Count II for declaratory judgment.  The Court has diversity jurisdiction over both counts.  28 U.S.C. § 1332(a)(1).  Section 1332(a)(1) provides federal courts with jurisdiction over all civil cases where the matter in controversy is in excess of $75,000 exclusive of interest and costs and is between citizens of different states.  In this case, both requirements are satisfied.  The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).

82.    Venue is proper in this district under 28 U.S.C. § 1391(b) because this is a civil action founded only on diversity jurisdiction.  Plaintiff resides in this district and a substantial part of the alleged events or omissions giving rise to Plaintiff's claims occurred in this district.

83.    Pursuant to the parties' agreement, New York law applies in this case.  The Contract provides that it "shall be deemed to have been entered into and shall be governed by and construed under the internal laws of the State of New York."  DX 1 § 13.3; DX 2. The Court finds this is an enforceable choice of law provision.  *See Fix v. Quantum Indus. Partners, LDC*, 374 F.3d 549, 552 (7th Cir. 2004).  Accordingly, the Court will apply New York law with respect to all issues relating to the Contract.

### B.    Breach Of Contract Claim

84.     Count I of the Complaint alleges breach of contract.  Under New York law, a breach of contract claim has four elements: (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage.  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 529 (S.D.N.Y. 2007) (applying New York law).  Pentech must prove each element by a preponderance of the evidence.  Pl. Agreed Facts ¶34.

### 1.     First and Second Elements

85.     The first and second elements, the existence of a contract and performance by plaintiff, are undisputed.  *Id.* at ¶¶33-35; Def.  Agreed Facts ¶¶3, 13, 15.  The Court concludes that the Contract is a valid, enforceable contract between Pentech and Par.  The Contract is a written agreement signed by the presidents of both companies and includes warranties by both parties of their respective signatories' authority to enter into a binding contract.  Both Pentech and Par provided adequate consideration and treated the Contract as in effect.  The Court also concludes that Pentech performed all conditions precedent under the Contract.

## 2. Third Element

86.     Regarding the third element, breach, the Court finds that Par breached the parties' agreement when it failed to pay Pentech 40 percent of amounts Par has received from sales of the paroxetine tablets, net of certain direct costs, and that Pentech is entitled to such payment under Section 2.3 of the Contract. While Pentech argues it is entitled to payment under Section 2.3, Par disputes this. Par contends Section 5.2 governs Pentech's share of the paroxetine tablet sales revenues, entitling Pentech to only a 15 percent share thereunder, net of certain expenses. Pl. Agreed Facts ¶37.

87.     Precedent instructs the Court to construe the Pentech-Par Contract to effectuate the intention of the parties as they expressed it in the contractual language, assuming such language does not fairly allow for more than one conclusion. *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (N.Y. 1990). Only when the terms of a contract are ambiguous may a court turn to evidence outside the agreement's four corners to ascertain the parties' intent. *In re Delmar Pediatrics Asthma & Allergy Care, P.C.*, 828 N.Y.S. 2d 589, 590 (N.Y. App. Div. 2006). Under New York law, "if [a] contract is ambiguous and relevant extrinsic evidence as to its meaning is available, its interpretation is a question of fact for the factfinder." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006). A contract is ambiguous if its terms are "reasonably susceptible to more than one interpretation." *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (N.Y. 1986). In other words, the central inquiry is whether the terms "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the

40

entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *DaPuzzo v. Globalvest Mgmt. Co.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003) (quoting *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). As the trier of fact, a court may consider extrinsic evidence "that clarifies the ambiguity, so long as the evidence is not inconsistent with the express terms of the contract." *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 517 (2d Cir. 2001).

88.     A court interpreting an ambiguous contract under New York law must select an interpretation that the language of the contract and the relevant extrinsic evidence reasonably permit. *See Chock Full O'Nuts Corp. v. Tetley, Inc.*, 152 F.3d 202, 205 (2d Cir. 1998); *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 161 (2d Cir. 2000).

89.     An omission in a contract, such as a failure to include a specific contingency, does not permit the court to imply a term or interpret the contract in a way that is inconsistent with the language of the contract. A failure to include in a contract a contingency that arises does not necessarily create an ambiguity that requires interpretation. *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001). Even if a contingency is omitted, courts applying New York law will not necessarily imply a term since "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.'" *Id.* (quoting *Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (App. Div. 1983)). Nor may the

41

court "imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Id.* Where terms of a contract are clear, the fact that events unfold differently than the parties had anticipated or intended does not excuse compliance with the terms. "Provision for the possibility that events may turn out differently than the parties anticipate is a common feature of commercial contracts." *Burke v. Steinmann*, No. 03 Civ. 1390, 2004 WL 1117891, at *5 (S.D.N.Y. May 18, 2004).

90.    New York law instructs that courts "should adopt the construction of the contract that reasonably harmonizes [its] provisions and avoids [an] inconsistency." *James v. Jamie Towers Housing Co., Inc.*, 743 N.Y.S.2d 85, 87 (App. Div. 2002).

91.    A court should construe a contract to further the parties' economic purposes in entering into the transaction. *See IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, 665 N.Y.S.2d 645, 645 (N.Y. App. Div. 1997) (rejecting contract interpretation where "Plaintiff's proffered view of the transaction would have made no economic sense for defendant and would have frustrated defendant's explicit central purpose in entering into the transaction").

### a.      Section 2.3 Governs the Settlement.

92.     District Judge Mark Filip entered an order denying summary judgment in which he concluded as a matter of law that the Contract is ambiguous concerning how the parties intended to divide amounts received from sales of the paroxetine tablets provided by GSK.  Dkt. 202 at 19-23.  Based on the applicable legal principles as well as the evidence heard and introduced at trial, the Court concludes the parties intended to divide such amounts Par 60%/Pentech 40% as provided in Section 2.3.

93.     The original text of Section 2.3 provided that the GSK Litigation could only be settled upon the mutual satisfactory approval of Par and Pentech.  PX 29, § 2.3. Consistent therewith, Tarriff testified that, because of Section 2.3, any settlement impacting Par's ability to market the product would have required Par and Pentech to sit down and work out an agreement before they could go to market.  T. 750:12-17; 753:4-8.  Thus, Par could not get to market by settling with GSK without Pentech's agreement regarding how to divide the proceeds thereof.

94.     Thereafter, in the 2002 Amendment, the parties added the second paragraph to Section 2.3 of the 2001 Agreement concerning the division of amounts received "out of" settlement.  DX 2.  A primary goal of the 2002 Amendment was to deal with the potential GSK settlement.  T. 380: 9-19.  Notably, as discussed below, the second paragraph employs broad language with respect to settlement.

95.     Although there is some dispute as to what was discussed among Hummel, Tarriff and Campanelli concerning the settlement offer GSK made to Pentech in July 2002,

the undisputed evidence shows Hummel, Tarriff and Campanelli knew in advance of the execution of the 2002 Amendment that there was a prospect of settlement with GSK under which GSK would provide a supply of paroxetine product that could be marketed for treatment of depression.  *See, e.g.,* PX 46 and 47; T. 200:4-12; 754:3-12; 884:2-887:13. Indeed, GSK consistently rejected the inclusion of a cash element in the settlement.  T. 200:4-201:16; 482:2-24; 766:13-16.

96.    With the knowledge that there was a prospect of settlement with GSK under which GSK would not provide cash but instead would provide a supply of paroxetine product that could be marketed for treatment of depression, the parties added a second paragraph to Section 2.3.  Significantly, the parties used broad language to describe the parties' respective shares of "amounts received" "out of" any settlement.  The operative language in Section 2.3 allocates 40 percent to Pentech and 60 percent to Par of amounts received out of "any settlement to which Pentech and a third party are parties, which relates to paroxetine . . . ." The parties chose the word "any," which has a well-known, all-encompassing meaning.  The principal definition of "any" is "one or some of a thing or number of things."  CONCISE OXFORD ENGLISH DICTIONARY p. 59 (2007); *see Fama v. Metro. Prop. & Cas. Ins. Co.*, 646 N.Y.S.2d 930, 934 (Sup. Ct. 1996) (regarding dictionary definitions as "useful guideposts" to courts in interpreting contracts).  Thus, provided that a settlement was encompassed within the coverage of the second and third clauses of Section 2.3 (*i.e.*, "to which Pentech and a third party are parties" and "which relates to paroxetine"), then "any" such settlement, regardless of its particulars, is subject to Section 2.3's sharing provisions.

97.     The second clause of Section 2.3—"to which Pentech and a third party are parties"— encompasses the Settlement Agreement to which Pentech and GSK (a "third party" in accordance with the terms of the Contract) are parties.

98.     Likewise, there is no dispute that the Settlement Agreement "relates to paroxetine" and thus, comports with the third clause of Section 2.3.

99.     Par offers several reasons why Section 2.3 should not govern the parties' division of sales revenues, but the Court does not find them persuasive. First, Par argues Section 2.3 was intended to apply only to "cash" or "direct payments" received in settlement. Significantly, however, the text of Section 2.3 does not explicitly address "cash" or "direct payments." Rather, it more broadly addresses "amounts" "out of" settlement. The word "amounts" denotes quantity generally; not just cash. *See, e.g.,* CONCISE OXFORD ENGLISH DICTIONARY, p. 43 (2004). Section 2.3 does not refer to "cash," "payments" or amounts "paid" in settlement, although the words "cash," "paid" and "pay" are used in other provisions of the Contract. *See, e.g.*, DX1 Art. 1, Definition of "Net Sales" (cash); § 2.1 (pay, cash); § 2.2 (pay, paid); § 5.2 (pay). Moreover, even if the Court were able to treat "amounts" as a synonym for "cash," the phrase "*out of* such a settlement" denotes a causal relationship that would encompass proceeds of Par's sales of GSK manufactured paroxetine tablets. *See, e.g., Levitt v. Peluso*, 638 N.Y.S.2d 878, 880 (Sup. Ct. 1995) ("the phrase 'arising out of' must be interpreted in a broad and comprehensive sense to mean 'originating from' or 'growing out of'"); *Landpen Co. v. Maryland Cas. Co.*, No. 03-C-3624, 2005 WL 356809, at *6 (S.D.N.Y. Feb. 15, 2005) (construing phrase "arising out of" to have a "broad,

45

general, comprehensive" meaning, "ordinarily understood to mean originating from, incident to, or having connection with").

100. Moreover, to interpret Section 2.3 in the manner urged by Par would require the Court to limit the scope of Section 2.3 in ways the parties did not explicitly provide. New York law precludes the Court from introducing new, unexpressed limitations into the Contract in this manner. If the individuals who negotiated the 2002 Amendment had intended to limit the reach of Section 2.3 to "direct payments," "reverse payments" or "cash payments" received in settlement, they were all familiar with these phrases, and they could easily have used them in Section 2.3 to modify, or in place of, the obviously broader term, "amounts." Given the conspicuous absence of any such limiting language, the Court will not read an implied limitation into Section 2.3. *E.g., Goldstein v. Accuscan, Inc.*, 2 N.Y.3d 811, 812 (N.Y. 2004); *Signature Realty v. Tallman*, 2 N.Y.3d 810, 811 (N.Y. 2004); *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475-76 (N.Y. 2004); *Worcester Creameries, Corp. v. City of New York*, 861 N.Y.S. 2d 198, 201-03 (N.Y. App. Div. 2008). If Par wanted limiting language in the Contract, it should have included it:

> [T]he party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation.

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 571 (N.Y. 2002)

101.   Par also argues, with reference to extrinsic evidence, that the License and Supply Agreement was intended to be independent from the Settlement Agreement, and "stand on its own." *See., e.g.*, T. 667:24-669:12.  Par contends that, because the License and Supply Agreement was a "stand alone" agreement to which Pentech is not a party, the Court should conclude the revenues from Par's sales of the paroxetine tablets are not amounts "received by Par and Pentech out of" the settlement with GSK, as contemplated by Section 2.3 of the Contract.  For the reasons set forth in Paragraph 69**,** *supra*, the Court is not persuaded by this argument.  That is, the evidence is clear that all parties to the settlement consistently treated the Settlement Agreement and License and Supply Agreement as a single unitary "settlement" of the GSK Litigation among Pentech, Par and GSK.  Therefore, the only prudent reading of Section 2.3 is that it encompasses all value received in consideration of the settlement, of which the paroxetine tablet revenues were a principal component.

102.   Finally, Par argues it would have been commercially unreasonable, or absurd, for Pentech and Par to agree to divide prospective product sales 60/40 at a time when both parties agreed Par was going to assume a greater share of the expense and risk of the project and, in exchange, was going to receive a greater share of the profit splits under Section 5.2. This argument, too, is unpersuasive.  To be sure, there is no dispute that the 2002

47

Amendment provided Par with a greater share of prospective capsule sales under Section 5.2 in recognition of the significant new risk and expense Par would incur in order to get Pentech's capsule manufactured and on the market. DX 2 § 5.2. Significantly, however, the parties could reasonably have anticipated that in the event of a settlement with GSK, Par's risks tied to capsule manufacturing and Paragraph IV Litigation defense would be diminished, and the potential overall reward would be increased. *See, e.g.,* PX 43; PX 122; T. 422:19-423:10; 586:20-587:2; 671:22-673:16. At the time the Contract was amended, Par and Pentech both knew GSK had offered to provide a supply of paroxetine product to settle the case, and both parties believed a settlement with GSK was a reasonably likely outcome. *See., e.g.,* PX 46 and 47; T. 200:4-12; 754:3-12; 884:2-887:13. In sum, in light of the language of the Contract and the extrinsic evidence, the Court concludes that Section 2.3 governs the GSK settlement.

**b.**     **Section 5.2 of the Contract is Inapplicable to the Settlement.**

103.    Par contends Section 5.2(B) of the Contract governs the parties respective shares of the revenues from Par's sales of GSK's unbranded tablets despite Section 2.3. However, provisions of Section 5.2 and Article 5 (in which Section 5.2 is contained), when read in context with other Contract language, make plain that the parties intended for Section 5.2 to apply only in a situation where Par was on the market with Pentech's paroxetine capsules.

104.    In essence, Par argues Section 5.2 *must* apply to any situation in which Par is marketing generic paroxetine, even if the opportunity to market only arose out of a settlement

48

of the GSK Litigation. The Court disagrees. Par's reading of Section 5.2 is at odds with the text of the original paragraph of Section 2.3, which provided that, in the event of any prospective settlement "regarding the ability of Par to market the Product," Pentech and Par were required to sit down and work out a deal. As Par admitted in its Answer to Pentech's Complaint, "[t]he Supply and Marketing Agreement made no provision for the consequence of a settlement of the Paragraph IV Litigation under which Pentech's form of paroxetine would not be manufactured and marketed." PX 179, ¶20. Given that the parties had not intended for such a settlement to be governed by Section 5.2 of the Supply and Marketing Agreement, Par has failed to explain why the Court should attach a different meaning to Section 5.2 as it is set out in the 2002 Amendment. The extrinsic evidence of the parties' negotiations shows no such intent to alter the intended scope of Section 5.2. The evidence establishes Section 5.2 set forth the financial terms that would apply in the event that the parties prevailed in the GSK Litigation and succeeded in marketing the Pentech capsule. The only tablet sales ever discussed in the context of Section 5.2 were Par's prospective sales of a Genpharm tablet. The evidence also shows that, at Hummel's request, Par agreed to give Pentech a 15 percent payment of profits from any such sales as a protective measure in the event the Genpharm tablet sales "cannibalized" sales of Pentech's capsule. That 15 percent share was unchanged by the 2002 Amendment.

105. The parties raise a number of additional interesting issues, but they are not relevant to this Court's decision. Those issues include the interpretation of the phrase

"subject to Section 3.1" contained in Section 5.2 and the events surrounding efforts to settle this dispute prior to litigation.

106.    The title of Article 5—"Payment For The Product"— is significant.  PX 29. "Captions are relevant to contract interpretation."  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 85 (2d Cir. 2002).  "Product" is a term defined in Article 1 and Exhibit A, and solely refers to Pentech's capsule form of paroxetine except in those instances in which the Agreement expressly states otherwise.  The Court finds, based on the text of the agreement and the circumstances surrounding its execution, that the defined term "Product" referred to Pentech's capsule except in those instances in which the Agreement expressly provides otherwise through the use of the phrase "the tablet version [or "form"] of the Product."  PX 29.  Under the GSK Settlement, "the Product" became irrelevant and, thus, there was no "Payment For The Product."

107.    In addition, Section 5.2 is titled "Profit Payments."  Subsections 5.2(A) and 5.2(B) each provide for Pentech to receive a "Profit Payment" under certain circumstances. "Profit Payment" is a term defined in Article 1 and Section 5.1 of the Contract, and is determined by sales of any "Product."  PX 29.  Under the License and Supply Agreement, there are no "Profit Payments" to be paid to Par.  Moreover, the initial sentence of Section

5.2 provides for Par to receive Profit Payments "*[i]n addition to the Transfer/Contract Price Payment*." (Emphasis added.) Section 5.1, in turn, defines the Transfer/Contract/Price Payment as a function of "the Product delivered by Pentech to Par pursuant to a Firm Order." Pentech never delivered "the Product" to Par, so there never was a Transfer Contract/Price Payment to Par. In the absence thereof, Par would not be entitled to any Profit Payment under the express language of Section 5.2. That section could not, therefore, apply to revenues from Par's sales of GSK manufactured paroxetine.

108. The clear intended coverage of Article 5 and Section 5.2 was for circumstances in which the paroxetine capsule "Product" was approved by the FDA and "on the market." A reasonable person reading an index to the entire Contract would not logically refer to Article 5 or Section 5.2 to learn how to deal with the gains from the GSK settlement. Instead, a reader would look at Article 2 (which includes "Settlement" in its title) and Section 2.3 (titled "Settlement").[3]

109. Moreover, Section 5.3(B) of the Supply and Marketing Agreement, which was not changed by the 2002 Amendment, calls for Profit Payments with respect to Par sales of paroxetine in *tablet* form to be made only after the launch date of Pentech's capsule "Product." Specifically, Section 5.3(B) provides:

---

[3]Some contracts contain a clause negating the interpretational significance of headings. *See, e.g.*, PX 117, § 9.10. Neither the Supply and Marketing Agreement nor the 2002 Amendment contains any such clause.

> Profit Payment. The initial Profit Payment for the Product shall be made within seventy-five (75) days *after the launch of the Product by Par. Thereafter*, payment of the Profit Payment *for the Product* and *the tablet version of the Product, if applicable,* shall be made within ten (10) days of the end of each calendar month. Within fifteen (15) days of the end of each calendar quarter, Par shall deliver to Pentech a report showing in reasonable detail the calculation of net Sales, Cost of Goods, and Gross Profit for the Product, and if applicable the tablet version of the Product, for such previous quarter.

PX 29 at § 5.3(B) (emphasis added). Because Section 5.3(B) provides that Profit Payments with respect to "the tablet version of the Product, if applicable" will be made "thereafter," and because "thereafter" refers to the time after "the launch of the Product by Par," this section indicates that before Par becomes obligated to make such Profit Payments there must first be the "launch" of Pentech's capsule.

110.    There is no dispute that Par began marketing the GSK-supplied paroxetine tablets in Puerto Rico in May 2003. PX 142 at p. 20. *See also* PX 120; T. 484:5-16; 685:7-686:19. Hummel's testimony that Par did not provide reports as required by Section 5.3(B) for the Puerto Rico sales (T. 485:21-486:5) was uncontradicted (*cf.* T. 713:16-20), and indicates Par did not regard the sales of the GSK-supplied tablets as subject to Section 5.2 of the Contract.

111.    Moreover, Hummel informed Campanelli of Pentech's understanding that it was to receive 40 percent of the amounts Par received from its sales of GSK's tablets *before* either Par or Pentech approved the settlement with GSK. *See, e.g.,* T. 917:5-919:11; 922:5-922:11; 990:7-991:8. However, Par failed to inform Pentech prior to December 2003 that

Pentech was to receive only a 15 percent share. T. 280:3-12. Hummel also testified that at no time during the period from July 2002 until April 2003, the date on which the Amended and Restated License and Supply Agreement between GSK and Par was executed, did any Par representative indicate Pentech's share would be only 15 percent. T. 267:8-16. To the contrary, even though Par's representatives were aware of Hummel's view that Pentech was entitled to a 40 percent share, no one from Par disputed his view. T. 267:17-268:18. Significantly, Tarriff admitted there was no contemporaneous document showing Par communicated to Pentech that Pentech's share was only 15 percent. T. 709:20-710:4.

112.    This Court has considered this evidence to the extent that it provides reliable insight into the parties' intentions or helps the Court weigh the witnesses' credibility. *See CBS Corp. v. Northrop Grumman Corp.*, 53 F. Supp. 2d 629, 630-31, n.1 (S.D.N.Y. 1999) (statements of party are admissions which are admissible evidence of intent).

113.    In sum, having considered all relevant evidence, the Court concludes Section 2.3, and not Section 5.2, governs Pentech's share of the revenues from the paroxetine tablet sales. The Court also concludes Par has breached the Contract because it has failed to pay Pentech the full amount due under Section 2.3.

### 3.    Fourth Element

114.    Regarding the fourth element, damages, it is clear Pentech suffered damages by fulfilling the terms of the Contract without the agreed-upon compensation. Pursuant to paragraph 1 of the Stipulation and Order entered on December 15, 2008 (the "December 15, 2008 Stipulation" (Dkt. 269)), the Court finds the payment due Pentech for paroxetine sales

53

as of September 30, 2007, is $49.5 million, excluding prejudgment interest.  Accordingly, the Court holds that Par owes Pentech the sum of $49.5 million (the "Base Judgment Amount"), in addition to the amount for interest set forth below. *See infra*, III.D.

## C.    Declaratory Judgment

115.    As a result of the Stipulation the parties submitted on December 18, 2008 (the "December 18 Stipulation"), declaratory judgment regarding the parties' ongoing rights and obligations under the Contract is no longer appropriate in this case.  Pursuant to paragraphs 1 and 2 of the December 18 Stipulation, Par's liability to Pentech for paroxetine sales after September 30, 2007 is not an issue in this litigation.  Consistent with the December 18 Stipulation, the Court finds that both Par and Pentech reserve all legal rights with respect to paroxetine-related revenues and liabilities subsequent to September 30, 2007.

## D.    Interest

116.    Pursuant to paragraph 1 of the December 15, 2008 Stipulation, the Court finds the amount due Pentech for paroxetine sales as of September 30, 2007 is $49.5 million, which represents the Base Judgment Amount, excluding prejudgment interest. *See* Dkt. 269.

117.    In addition to its share of the revenues from the paroxetine tablet sales, Plaintiff is entitled to prejudgment interest on the Base Judgment Amount of $49.5 million under breach of contract as provided by the applicable New York statute, N.Y. C.P.L.R. §§ 5001, 5004 (2007). *See Fulcrum Fin. Advisors, Ltd. v. BCI Aircraft Leasing, Inc.*, 354 F. Supp. 2d 817, 828-29 (N.D. Ill.  2005) (finding New York statute entitled plaintiff to recover interest with respect to its successful claim for breach of contract).

54

118.    Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ." N.Y. C.P.L.R. § 5001(a). "[T]he purpose of awarding interest is to make an aggrieved party whole." *Spodek v. Park Prop. Dev. Assoc.*, 96 N.Y.2d 577, 581 (2001). The rationale for this approach was explained by Chief Justice Cardozo in *Prager v. N.J. Fid. & Plate Glass Ins. Co.*, 245 N.Y. 1, 5-6 (N.Y. 1927), and is equally relevant today:

> While the dispute as to value was going on, the defendant had the benefit of the money, and the plaintiff was without it. Interest must be added if we are to make the plaintiff whole . . . . If [defendant] chose to keep the money, it should pay for what it kept. There would be obvious injustice if interest would be lost as the result of a slight discrepancy between the claim and the award.

*Id.* In this case, Par had the benefit of the money while the dispute occurred, and it would be an injustice to withhold interest on the money to which Pentech is entitled.

119.    "Under New York law, 'prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract.'" *Donovan v. Dairy Farmers of Am.*, 53 F.Supp.2d 194, 197 (N.D.N.Y. 1999) (quoting *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984) (interpreting New York law)). Interest is calculated "at the rate of nine per centum per annum, except where otherwise provided by statute." N.Y. C.P.L.R. § 5004. In a contract matter, the plaintiff bears the burden of proof with respect to damages. *Peak v. Northway Travel Trailers, Inc.*, 811 N.Y.S.2d 798, 799 (App. Div. 2006).

120.    New York courts have held that "[w]here a contract does not specify a date or time for performance, New York law implies a reasonable time period." *Guilbert v.*

*Gardner*, 480 F.3d 140, 149-50 (2d Cir. 2007)); *see also Smith Barney, Harris Upham & Co. Inc. v. Liechtensteinische Landesbank*, 866 F. Supp. 114, 117-18 (S.D.N.Y. 1994) (listing factors courts consider "[i]n determining what constitutes a reasonable time for performance"); *First Sec. Mortgage Co. v. Goldmark Plastics Compounds, Inc.*, 862 F. Supp. 918, 938 (E.D.N.Y. 1994) (where contract failed to specify time for payment, court enforced implied obligation to pay within ninety days); *Savasta v. Newport Assocs.*, 82 N.Y.2d 763, 765 (N.Y. 1993) (where contract was silent as to time period within which certain written notice was required, court enforced an implied reasonable time period).

121. "Interest shall be computed from the earliest ascertainable date the cause of action existed. . . ." N.Y. C.P.L.R. § 5001(b). The Court has broad discretion in determining a reasonable date from which to award interest. *See Pozament Corp. v. AES Westover, LLC*, 857 N.Y.S.2d 766, 767 (App. Div. 2008) (observing that the New York prejudgment interest statute "vests the court with broad discretion in determining a reasonable date from which to award interest"). The date chosen should be a "reasonable date" and should "make[] logical sense under the facts of [the] case." *Id.*

122. Pentech's expert, Kathleen Kedrowski ("Kedrowski"), calculated interest under Section 2.3 based upon payments to Pentech that became due on a quarterly basis after sales of generic paroxetine tablets supplied by GSK commenced and continued through September 30, 2007. PX 196; T. 1158:23-1159:5. Specifically, Kedrowski employed a quarterly payment schedule, with payments due from sixty days after the end of each calendar quarter on amounts due Pentech for sales by Par of paroxetine tablets during the preceding calendar

quarter. T. 1158:23-1159:5. Kedrowski referenced the frequency of royalty payments made by Par to GSK under the terms of Section 3.3 of the Amended GSK License and Supply Agreement. T. 1158:23-1159:15; 1159:9-1159:20; DX 6. The Court finds referencing the frequency of royalty payments in that agreement is reasonable in light of the facts of this case. Moreover, the Court notes Par's expert, Steven Young ("Young"), did not base certain of his interest calculations upon contractual provisions. *See, e.g.*, T. 1188:5-7; 1185:19-1186:6; 1193:19-1194:7. In sum, using a quarterly payment schedule, Kedrowski calculated interest under Section 2.3 in the amount of $14,377,386 through September 30, 2007, with $12,205 per diem interest due thereafter through December 9, 2008, for total interest due through that date of $19,698,766. *See* PX 196 at Tabs 4 and 5, as revised by the December 15, 2008 Stipulation (Dkt. 269).

123.    This Court finds Kedrowski's approach to be reasonable in light of the particular facts of this case. A quarterly payment schedule is in line with the schedule by which royalty payments are made by Par to GSK and Genpharm. T. 1101:15-1102:8; 1103:12-21; PX 117. Not only is such a payment schedule in line with Par's business practices and accounting practices, it is also reasonable to infer that such a payment schedule works well from a business standpoint and allows for accurate payments. *See, e.g.*, T. 1105:5-7. Thus, a quarterly payment schedule is logical given the facts of the case. It is not burdensome to Par, as Par employs quarterly payment structures with other companies, including GSK and Genpharm.

124.    Commencing a quarterly payment schedule, with payments due from sixty days after the end of each calendar quarter on amounts due Pentech for sales by Par of paroxetine tablets during the preceding calendar quarter, as of the start of GSK tablet sales on September 8, 2003, constitutes a reasonable time period for performance under Section 2.3.  *See* Def. Agreed Facts ¶19.  Par began selling generic paroxetine tablets supplied by GSK pursuant to the settlement on September 8, 2003.  PX 158.  As part of an attempt to resolve the parties' ongoing dispute, Par paid Pentech $16,176,762 in December 2003.[4]  DX 208 ¶26.  Pentech initiated this lawsuit on May 3, 2004.  Dkt.  1.  Thereafter, Par continued to market paroxetine supplied by GSK.  In light of these facts and the principles discussed above, the Court concludes a quarterly payment schedule commenced based upon third quarter 2003 sales as set forth by Kedrowski.  Specifically, Par began selling generic paroxetine tablets supplied by GSK in the third quarter of 2003.  Thus, a reasonable time for payment of amounts due Pentech for sales by Par of paroxetine tablets during third quarter 2003 was within sixty days after the end of third quarter 2003.

125.    Pursuant to its broad discretion in determining a date from which to award interest, the Court also concludes interest should be computed from the earliest ascertainable date the cause of action existed, which was when Par began to realize revenues from the paroxetine sales but did not make its first payment to Pentech pursuant to the aforementioned

---

[4]Kedrowski accounted for this payment by deducting an interest credit from the amount of interest due Pentech based upon the stipulated damages amount.  *See* PX 196 at Tab 4, as revised by the December 15, 2008 Stipulation (Dkt. 269).

quarterly payment schedule. Thus, as set forth in Kedrowski's interest calculations, interest is to be computed from third quarter 2003. PX 196**.**

126. Par argues that if Section 2.3 were applied to divide market revenues, Par's obligation to make a payment to Pentech on revenues earned under the GSK license agreement would most reasonably be held to have accrued when Par completed its sales of paroxetine tablets under that agreement. In that scenario, Par argues, the total amount due Pentech under Section 2.3 would become known and fixed and could thus be divided between the parties after applying the permitted up-front deductions. Dkt. 282, at ¶2; Par's Proposed Findings of Fact and Conclusions of Law ¶181; T. 1368-69. This Court disagrees. As discussed above, this Court believes it would be unreasonable to await the completion of Par's sales of paroxetine tablets before triggering Par's obligation to make a payment to Pentech pursuant to Section 2.3. Instead, as the terms of Section 3.3 of the Amended GSK License and Supply Agreement demonstrate, it is far more commercially reasonable to conduct sales reporting and payment within sixty days after the end of each calendar quarter for the preceding calendar quarter. PX 117. In light of the December 15, 2008 Stipulation, any issues regarding the amount of damages are taken out of the case. That is, the amount of interest due Pentech is based upon the stipulated payment numbers. *See* Dkt. 269 ¶¶1 and 3. Thus, the stipulated payment numbers and Kedrowski's interest calculations account for Par's December 2003 payment to Pentech as well as for reimbursement to Par of all of its direct costs pursuant to Section 2.3.

59

127.    Par challenges the reliability of Kedrowski's interest calculation, arguing it fails to take into account the effects of Par's restatement of its paroxetine sales. As explained by Par's expert, Young, Par in 2006 restated downward its paroxetine revenue for previous years. T. 1193: 1-18. However, Young acknowledged Kedrowski addressed this restatement in her interest calculation with a large credit in 2006. T. 1193: 16-18.

128.    This Court finds Kedrowski's approach with respect to the credit to be reasonable. Moreover, the Court reaches this conclusion in light of its broad discretion in determining interest and its finding that Kedrowski's testimony is credible.

129.    Accordingly, in this case, damages are $49.5 million, which constitutes the Base Judgment Amount. Par shall pay Pentech prejudgment interest on the Base Judgment Amount at the rate of 9 percent per annum simple interest as provided by the applicable New York statute, N.Y. C.P.L.R. §§ 5001, 5004 (2007). Interest has been calculated at 9 percent simple interest, with interest running from sixty (60) days after the end of each calendar quarter on amounts due Pentech for sales by Par of paroxetine tablets during the preceding calendar quarter. This is a reasonable due date and corresponds to the provisions of Section 3.3 of the License and Supply Agreement under which Par pays its royalty to GSK. PX 117, § 3.3. The Court notes this is somewhat more favorable to Par than the provisions of the Genpharm Agreement between Genpharm and Par's parent company, under which payments are due within thirty days following the end of each calendar quarter. PX 10, § 6.4.

130.    As of December 9, 2008, the date on which the bench trial commenced, the total interest accrued on the Base Judgment Amount was $19,698,766. Interest accrues after

60

December 9, 2008 at the rate of $12,205.00 per day. PX 196 at Tab 5, as revised by the December 15, 2008 Stipulation (Dkt. 269). Thus, the total amount of interest due Pentech for the period from December 10, 2008, through February 9, 2009, the date of judgment, is calculated at the rate of $12,205.00 per day and totals $756, 710. In sum, damages are $49.5 million. Interest totals $20,455,476. Therefore, the total amount due to Pentech from Par is $69,955,476.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Pentech Pharmaceuticals, Inc., is entitled to damages from Defendant Par Pharmaceutical, Inc. for breach of contract in the amount of $49.5 million, plus interest in the amount of $20,455,476. Although this Memorandum Opinion and Order spans many pages, this is a relatively simple case. Both the broad language used in Section 2.3 and the extrinsic evidence support the conclusion that the parties intended Section 2.3 to encompass the GSK settlement.


**Judgment is hereby entered in favor of Plaintiff Pentech Pharmaceuticals, Inc., and against Defendant Par Pharmaceutical, Inc., in the total amount of $69,955,476. Plaintiff, as the prevailing party, is also entitled to recover its court costs against Defendant.**

**SO ORDERED THIS 9th DAY OF FEBRUARY, 2009**

_Morton Denlow_
_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

61

**Copies sent to:**

Eric N. Macey
P. Andrew Fleming
John F. Shonkwiler
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606

J. Jerome Hartzell
Hartzell & Whiteman, LLP
2626 Glenwood Avenue, Suite 500
Raleigh, NC 27608

Counsel for Plaintiff

Roger G. Brooks
Darin P. McAtee
Rajeev K. Adlakha
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Richard J. Prendergast
Michael T. Layden
Richard J.  Prendergast, Ltd.
111 W. Washington St.
Suite 1100
Chicago, IL 60602

Counsel for Defendant